# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

ROGERS et al. v. VIRGINIA–CAROLINA CHEMICAL CO.

(Circuit Court of Appeals, Third Circuit. November 30, 1906.)

No. 32.

**1. PLEADING—MATTERS OF FACT OR CONCLUSIONS—ALLEGATIONS OF AUTHORITY OF AGENT.**

In an action against a corporation for fraud arising out of transactions between plaintiffs and an individual, allegations in the declaration that all of such person's negotiations, contracts, transactions and acts complained of were carried on, executed, performed, and done by him in pursuance of authority conferred on him by defendant, as its agent, and with its knowledge and consent in furtherance of a fraudulent scheme of defendant, are sufficient on demurrer to charge defendants with responsibility for such acts, without setting out evidence of such person's authority or agency.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Pleading, § 26.]

**2. FRAUD—PLEADING—ALLEGATIONS OF DAMAGE.**

The declaration in an action for fraud and deceit alleged that plaintiffs held options for the purchase of phosphate lands and phosphate deposits which were worth $150,000, and that defendant, in pursuance of a fraudulent scheme to prevent plaintiffs from selling the options to others, and to the end that they might expire and enable it to purchase the property from the owners, by means of false and fraudulent representations of its desire and intention to purchase the options, induced plaintiffs to enter into a contract giving it the exclusive right to do so for a stated time, whereby plaintiffs were prevented from selling the options to others, by which sale they would have received a profit of $150,000, and were deprived of their rights thereunder, to their damage in the sum of $150,000. *Held*, that such declaration was sufficient on demurrer to show that plaintiffs were damaged by the alleged fraud, and that it was unnecessary to allege that they could and would have sold the options to others and derived a profit therefrom.

**3. SAME—GROUNDS OF ACTION—FALSE REPRESENTATION AS TO INTENT.**

There is a prima facie presumption of fairness and honesty in the dealings of mankind, and where one man makes a promise to another as an inducement for a change of position on the part of the latter he impliedly, if not expressly, avers that he has an existing intent to fulfill his promise, and such implied averment of an existing intent is of matter of fact, and, if false and fraudulent, is a fraudulent representation, which

149 F.—1

may, if acted on, furnish the basis for an action ex delicto in the nature of deceit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, § 14.]

4. SAME.

The declaration in an action for fraud and deceit construed on demurrer, and *held* to state a cause of action.

In Error to the Circuit Court of the United States for the District of New Jersey.

Horace L. Cheyney, for plaintiffs in error.

Frederic J. Faulks, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

BRADFORD, District Judge. This writ of error was taken by George H. Rogers and John G. Gray to reverse a judgment of the circuit court of the United States for the district of New Jersey on a demurrer to an amended declaration in an action brought by them against the Virginia-Carolina Chemical Company. The declaration is in case for an alleged tort. It alleges in substance, among other things, that the plaintiffs in 1901 "by the outlay of large sums of money and after great labor procured options for the purchase of certain lands, containing deposits of phosphate rock, and for the purchase of phosphate rock deposited upon certain other lands situate in the State of Tennessee".; that the options were all obtained in June, 1901, and "by the terms thereof remained in force for periods of from 60 to 100 days, with provision for extension thereof for such further time as might be necessary to complete the examination of the properties and consummate the transaction, provided the periods of time mentioned in said options should be insufficient to complete the investigation of said properties in Tennessee upon which the plaintiffs held similar options"; that "the property covered by said options contained some of the richest deposits of phosphate rock in the Tennessee phosphate fields"; that the options were worth $150,000; that "after said options were obtained, the plaintiffs entered into negotiations for the sale of the same and of the rights conveyed thereunder, with the officers of several railroads whose lines ran through said phosphate fields or could be extended thereto, and with other persons likely to purchase the same"; that among the other persons to whom the options were offered for sale was one of the directors of the defendant; that after several interviews with that director the latter referred the plaintiffs to Charles S. Bryan, a broker of New York, "for the purpose of enabling the said Bryan to thereafter carry on and complete the negotiations for the purchase of said properties and rights covered by the said options on behalf of the party represented by the said director"; that Bryan during all of the negotiations and transactions thereafter mentioned in the declaration was the agent of the defendant, authorized and empowered by it to negotiate "for the purchase of the rights of the plaintiffs under said options and to enter into all agreements and to do all things that might be necessary for that purpose, and all of the negotiations, contracts, transactions and acts" of Bryan thereafter re-

terred to in the declaration were "carried on, executed, performed and done by him in pursuance of said authority and as agent for and on behalf of" the defendant, and "with its knowledge and consent"; that thereafter further negotiations were carried on between the plaintiffs and Bryan and a contract was entered into July 30, 1901, between the plaintiffs and Bryan, a copy of which was attached to the declaration, marked Exhibit A and made part thereof, whereby it was agreed, among other things, that Bryan "should examine the lands mentioned in said options with engineers and experts, to estimate to his satisfaction the quantity and quality of the phosphate rock thereon with a view to purchasing said lands, properties and mining rights, and that in no event should the said plaintiffs exercise any of the options for the purchase of properties mentioned in any of the schedules attached to said contract within ninety days from the date thereof, except with the consent of said Bryan"; that the contract also provided that, "if the said plaintiffs should at any time prior to January 1st, 1902, acquire any options of any other property they would execute with Bryan a similar agreement with respect to such properties"; that the contract also provided that upon the completion of the purchase of any of the lands covered by the options by Bryan, either directly from the owners of the property or by an assignment of the options from the plaintiffs, the latter should receive as commissions from Bryan certain rates or amounts per ton, as therein provided, on all phosphate rock on the property purchased as the same should be estimated by the engineers of Bryan; that prior to the execution of the contract of July 30, 1901, Bryan, acting as agent for and on behalf of the defendant, in order to secure the execution of that contract by the plaintiffs, and for the purpose of securing control over the options for the defendant until the expiration of the same and for the purpose of preventing the plaintiffs from offering the said options to persons other than the defendant, falsely and fraudulently and with intent to deceive the plaintiffs represented to them that, if they would execute the contract, then Bryan "as agent of the defendant would purchase the said lands and mining rights covered by said options, if the examination of said properties by his engineers should show that the said lands contained valuable deposits of phosphate rock, and would pay to the plaintiffs the commissions upon the purchase price thereof as set forth in said contract, if any of said properties should be purchased by said defendant company either directly or indirectly, and the plaintiffs relying upon the said representations of the said Bryan executed the said contract"; that "thereafter in accordance with the said agreement an examination was made of the properties covered by said options by the engineer of the said defendant company, and by its instructions, and said engineer by his report estimated the amount of phosphate rock deposited upon" certain lands mentioned in the declaration at 1,161,055 tons; that the estimate of the engineer as reported by him as to these lands was "not a true report of the amount of phosphate rock thereon and was made by said engineer in bad faith, and that according to the actual surveys and examination of said engineer and a proper estimate based thereon" the amount of phosphate rock thereon was 1,310,497 tons; that "the said surveys and examination showed

that the said lands contained valuable deposits of phosphate rock and said lands actually contained deposits of phosphate rock of great value"; that thereafter, October 25, 1901, Bryan acting for and on behalf of the defendant notified the plaintiffs that he did not care to purchase any of the properties mentioned in the contract of July 30, 1901; that "it was then impossible for the plaintiffs to renew said options"; that the defendant in advising the plaintiffs through Bryan that it did not care to purchase any of the properties covered by the options under the contract of July 30, 1901, did not act in good faith, but "knowing that the said options held by the plaintiffs would expire at once upon the refusal of the defendant to complete the purchase of said properties and that it would be impossible for the plaintiffs to renew such options", in bad faith declined to make said purchases, "and with the intention to deprive and defraud the plaintiffs of their commissions upon the purchase price of said properties under said contract and of their rights under said options, and with the purpose and intention of negotiating directly with the owners of said properties for the purchase thereof after the expiration of the options held by the plaintiffs"; that thereafter the defendant by its officers and agents entered into negotiations for the purchase of the properties theretofore mentioned in the declaration, excepting the Lockridge property which had already been purchased by it, upon the basis of the investigation and examination made by its engineer under the contract of July 30, 1901, and thereafter purchased a number of them, specified in the declaration; that "if the defendant had acted in good faith with the plaintiffs under said contract, in purchasing said properties and mining rights, the plaintiffs would have received as compensation or commission the sum of $91,734.99 upon the purchase of the properties of the International Phosphate Company, the Howard Phosphate Company and the Ridley Phosphate Company, being seven cents per ton upon 1,310,497 tons of phosphate rock contained in said properties, and the said plaintiffs would also have received the sum of $2,700 commission upon the sale of the said Lockridge property, being seven and one-half per cent. upon the purchase price of $36,000, and the plaintiffs would also have received the sum of $3,525, being commission at the rate of seven and one-half per cent. upon $47,000, the purchase price of the said Harlan property, a total of $97,959.99"; that "the fraudulent acts and misrepresentations of the defendant company and of the said Bryan, its agent, heretofore fully set forth, deprived the plaintiffs of their rights under said options of a value of $150,000, and prevented the plaintiffs from selling to persons other than the defendant the properties and mining rights hereinbefore particularly mentioned and the other properties set forth in the schedules A, B and C attached to said contract marked Exhibit 'A,' and that if the same had been sold by the plaintiffs to persons other than the defendant, they would have received a profit of $150,000 and upwards"; that "the defendant in all of the acts, negotiations, transactions and representations heretofore mentioned, done, conducted, carried on, executed and made by it and by its agent, the said Bryan, on its behalf, with the plaintiffs, did not act in good faith with the plaintiffs, but that the said acts, negotiations, contracts, transactions and representations were done, conducted, car-

ried on, executed and made in furtherance of a fraudulent scheme of the said defendant company to obtain control of the said options held by the plaintiffs during the entire existence of the same, to prevent the plaintiffs from negotiating and selling their rights under said options and the said properties and mining rights to persons other than the defendant, and to enable defendant to purchase said lands and mining rights directly from the owners thereof after the expiration of said options, without paying any commissions to the plaintiffs upon the purchase price of the said properties and rights covered by the said options as provided for in the contract heretofore mentioned, executed on July 30th, 1901, and that in consequence of said fraudulent scheme and of the fraudulent acts and misrepresentations of the defendant and its agents made in furtherance thereof and for the purpose of carrying out said fraudulent scheme, the plaintiffs have been damaged in the sum of one hundred and fifty thousand dollars ($150,000), wherefore they bring their suit." The agreement of July 30, 1901, as shown in Exhibit A attached to and made a part of the declaration is as follows:

"Exhibit 'A.'

Agreement made and entered into this 30th day of July, 1901, by and between George H. Rogers and John G. Gray, parties of the first part, hereinafter called Rogers and Gray, and Chas. T. Bryan, party of the second part, hereinafter called Bryan. Whereas, Rogers and Gray are the owners of certain options on phosphate lands, plants and property described in schedules 'A' and 'B' hereunto annexed, and also own or control options on certain phosphate lands in Maury, Hickman and Lewis Counties in the State of Tennessee, described in schedule 'C' hereunto annexed, and whereas Bryan is desirous of examining said lands with engineers and experts to estimate to his satisfaction the quality or value of the phosphate rock thereon and the property included in said options with a view of determining if he will purchase such lands and properties or any of them. Now it is agreed by and between the parties hereto in consideration of the promises herein made the one to the other as follows:

1st. Rogers and Gray agree they will afford to Bryan and his engineers and experts every opportunity that it may be possible for them to afford or reasonably obtain to make a full examination of all the properties covered by said options as said Bryan shall desire, and that in no event shall Rogers and Gray exercise any of the options mentioned in any of the schedules hereunto annexed within ninety days from date hereof, except such options covering properties as Bryan may before the expiration of ninety days notify them that he does not care either to attempt to negotiate the purchase of directly or take under any Rogers and Gray option covering the same.

(2) Second. That if at any time hereafter the said Bryan shall agree with the owner or owners of any one or more of the properties covered by said options to purchase any of the properties referred to therein either directly or indirectly, Rogers and Gray agree that in such event on request of Bryan they will release such owner or owners of said property from any obligation to them whatsoever arising by reason of said Rogers and Gray having from such owner or owners an option on that parcel of property. Upon the completion of the purchase of any parcel of property covered by any of said options Bryan shall pay to Rogers and Gray a sum which shall be equal to seven (7) cents per ton on all phosphate rock on said property purchased as the same shall be estimated to exist thereon by Bryan's engineers, provided said property shall be one of those enumerated in schedule 'A,' and if such property be one of those specified in 'B' or 'C' the said Bryan shall pay to Rogers and Gray (7½) seven and one-half per cent. on such price as Bryan may agree to pay to the owners thereof, and it is agreed by the said Bryan that he will not take any options upon or purchase or become interested directly or indirectly in any phosphate lands whatsoever within the State of Tennessee before De-

cember 31st, 1901, other than those which he may elect to purchase under this agreement, or such as may before such date be submitted by said Rogers and Gray or on which they shall receive such compensation and commissions. And said Bryan further agrees that he will by competent engineer or engineers selected by him investigate each of the properties referred to in said options with all reasonable diligence and if said Bryan shall not wish to acquire any property investigated he will so notify said Rogers and Gray on reaching that conclusion and they shall be at liberty to deal with said property and any option they hold thereon as if this contract had not been made. And it is further agreed between the parties hereto that if at any time within ninety days from the date hereof Bryan shall elect to take an assignment of any of the options mentioned in any of the schedules hereunto annexed instead of dealing independently of such options with the owners of the property covered by any such options, the said Rogers and Gray agree that they will assign to the said Bryan any such option he may elect to ask to be assigned to him as aforesaid, it being understood that in the event of such an assignment of the option if the said Bryan shall thereafter elect to exercise the same, the compensation of said Rogers and Gray upon the purchase by Bryan of the property covered by such assigned option shall be as hereinabove set forth as in the case of a purchase by Bryan of the property directly from the owner. And it is agreed that if the said Rogers and Gray shall at any time prior to January 1, 1902, acquire any options on any other property they will execute with Bryan at his election a similar agreement with respect to any such properties covered by such options as this agreement. The terms and conditions of this agreement shall be binding upon the executors, administrators and assigns of all parties hereto.

In Witness Whereof the parties hereto have hereunto set their hands and seals this day and year first above written.

|  |  |
| --- | --- |
| Geo. H. Rogers | [Seal.] |
| John G. Gray | [Seal.] |
| Chas. S. Bryan | [Seal.] |

In the presence of
R. H. Wright,
R. Oakley,
Willard Saulsbury.

Schedule 'A.'

International Phosphate Co.
Howard " "
Central " "
Central " "
Blue Grass " "
Summer Co. " "
Ridley " "
Jackson " "
H. G. Kitrell " "

Schedule 'B.'

Carpenter & Wilson
A. B. Harlan
Bethel Howard 2 tracts
R. J. Bryan

Schedule 'C.'

Hughes & Aiken
Lockridge
Bear Creek
Brownlow & Estes
Estes Bend
Porter Heirs
Hensley
S. C. Long
Bailey
Stockard
Walker
P. C. Kitrell
Hensley Heirs."

In addition to the foregoing averments the declaration sets forth a number of acts and practices on the part of the defendant, to which it is unnecessary particularly to refer, connected with its alleged fraudulent scheme to control the options held by the plaintiffs and deprive them of all beneficial enjoyment of their rights thereunder.

It is not necessary to consider seriatim all the assignments of error. The substantial questions raised by them are only three, namely: First, whether a case of actionable fraud is set forth in the amended

declaration; second, whether it appears therein that the plaintiffs suffered damage by reason of the acts, matters and things set forth and complained of; and, third, whether it appears from the declaration that Bryan, so far as concerned or participating in such acts, matters and things, was an agent of the defendant and acting in that capacity. It will be convenient to consider these points in their reverse order. The amended declaration, before stating the matters complained of, sets forth:

"For that the said Charles S. Bryan during all of the negotiations and transactions hereinafter mentioned was the agent of the Virginia-Carolina Chemical Company, authorized and empowered by said defendant to negotiate for the purchase of the rights of the plaintiffs under said options and to enter into all agreements and to do all things that might be necessary for that purpose, and all of the negotiations, contracts, transactions and acts of the said Charles S. Bryan hereinafter referred to were carried on, executed, performed and done by him in pursuance of said authority and as agent for and on behalf of the Virginia-Carolina Chemical Company, the defendant, and with its knowledge and consent."

Here it is expressly averred that all of Bryan's negotiations, contracts, transactions and acts, complained of, were carried on, executed, performed and done by him in pursuance of authority conferred on him by the defendant and with its knowledge and consent. It was not necessary, and would have been improper, to set forth the mere evidence of Bryan's authority or agency. Such authority and agency are averred as matters of fact, the truth of which is admitted by the demurrer. The contention on the part of the defendant that it does not appear that Bryan was authorized by it to commit a fraud on the plaintiffs fails for two reasons. First, if any negotiation, contract, transaction or act, entered into or done by him as agent, appears to have been fraudulent, its fraudulent nature cannot except or exclude it from the admission by the demurrer that it, including its fraudulent nature, was done pursuant to the authority of the defendant. Second, the amended declaration sets forth in its concluding paragraph that all the acts, negotiations, transactions and representations, thereinbefore mentioned, done, conducted and made by the defendant and Bryan, its agent, were "done, conducted, carried on, executed and made in furtherance of a fraudulent scheme of the said defendant company to obtain control of the said options" etc. Whether or not actionable fraud has been alleged will be considered later. But if it has been alleged, there can be no question that agency on the part of Bryan has been sufficiently averred.

The next question is whether it appears from the amended declaration that the plaintiffs suffered damage by reason of the acts, matters and things set forth and complained of. It is alleged that the options held and owned by the plaintiffs for the purchase of lands containing phosphate rock, and for the purchase of phosphate rock in other lands, in Tennessee, were of the value of $150,000. It is further alleged:

"That the fraudulent acts and misrepresentations of the defendant company and of the said Bryan, its agent, heretofore fully set forth, deprived the plaintiffs of their rights under said options of a value of $150,000, and prevented the plaintiffs from selling to persons other than the defendant the

properties and mining rights hereinbefore particularly mentioned and the other properties set forth in the schedules A, B and C attached to said contract, marked exhibit 'A,' and that if the same had been sold by the plaintiffs to persons other than the defendant, they would have received a profit of $150,-000 and upwards."

And further:

"That in consequence of said fraudulent scheme and of the fraudulent acts and misrepresentations of the defendant and its agents made in furtherance thereof and for the purpose of carrying out said fraudulent scheme, the plaintiffs have been damaged in the sum of one hundred and fifty thousand dollars ($150,000), wherefore they bring their suit."

If the foregoing averments, germane to the subject of damages, be considered alone, the demurrer admits that the plaintiffs owned and held options worth $150,000; that they were deprived by the defendant of their rights under them of the value of $150,000; and that they had consequently suffered damage to the amount of $150,000. It is urged on the part of the defendant that the declaration is fatally defective in omitting to allege that, "but for the fraud of the defendant the plaintiffs could and would have sold their options to another or others and derived a profit therefrom." But such an allegation clearly would have been unnecessary. This is not the case of excuse for the nonperformance of a condition precedent, where frequently it is necessary to the right of recovery to aver willingness and ability to perform on the part of the plaintiff and prevention or waiver on the part of the defendant. The suggested averment at most would have presented only matter of evidence. It is true that counsel for the plaintiffs stated in their brief and during the argument in this court that it was not possible for the plaintiffs to aver with certainty that except for the fraud of the defendant they could have sold to others the property covered by the options. But this statement in no sense is part of the record and in the consideration of the case on demurrer we are strictly confined to the record. So far as the record is concerned the options may have been valuable to the plaintiffs by reason of their ability to sell to others, or by reason of their ability to purchase for themselves, but whether their value depended on the former consideration or on the latter is wholly unimportant for the purposes of the present decision in view of the positive averment of their value and loss to the plaintiffs. The declaration alleges, as has already appeared, that all the options held and owned by the plaintiffs were executed in June, 1901, and by their terms were to remain in force for "periods of from 60 to 100 days, with provision for extension thereof for such further time as might be necessary to complete the examination of the properties and consummate the transaction, provided the periods of time mentioned in said options should be insufficient to complete the investigation of said properties in Tennessee upon which the plaintiffs held similar options." Unless renewed or extended, all of these options must have expired prior to October 9, 1901, that day next following the period of 100 days after the last day of June in that year. The declaration alleges that on October 25, 1901, Bryan "acting for and on behalf of the defendant company, notified the plaintiffs that he did not care to purchase any of the

properties" mentioned in the contract of July 30, 1901, and that "it was then impossible for the plaintiffs to renew said options." It is, urged by the defendant that, in the absence of any specific allegation of an extension or renewal of the options or that they were still in force, they must be treated as having expired before the plaintiffs were notified by Bryan as above mentioned, and, further, that if it can be gathered from the declaration that the options had been extended or renewed and did not expire until after the above notification, the plaintiffs were not damaged as they could after such notification have exercised the options. Much stress was laid by the defendant on the provision in the options for their extension "for such further time as might be necessary to complete the examination of the properties and consummate the transaction." These considerations do not strike us as entitled to weight. We cannot on this writ of error discharge the function of a jury. It is not for us to weigh the probability or improbability of the truth of statements of fact in the declaration. Of course, if it appears from the declaration that a statement of fact cannot possibly be true, it must be rejected. But such a statement, if there be a possibility of its truth, must on demurrer and subject to the requirement of reasonable and practicable particularity be accepted as true. If the options held and owned by the plaintiffs expired prior to October 9, 1901, and, consequently, before they received the notification from Bryan, it would not necessarily follow that the plaintiffs had not through fraud on the part of the defendant been deprived of their rights under the options and prevented from selling to other persons the properties and mining rights covered by them as expressly alleged in the declaration. Nor, if the options had been so extended or renewed as to be in force on and after October 9, 1901, and until and even after the date of the notification from Bryan, would it necessarily follow that the plaintiffs had not, through fraud on the part of the defendant, been deprived and prevented as above mentioned. Notwithstanding such extension or renewal, it is possible that the options remained in force for only such a short period after the notification from Bryan that it was practically impossible for the plaintiffs to exercise their rights under them after such notification; for the beneficial exercise of those rights may have involved the finding of purchasers as well as the completion of the "examination of the properties," in order to "consummate the transaction," and the conditions and limitations of such extension or renewal of options are not set forth in the declaration. But it is unnecessary to elaborate this particular branch of the discussion. The declaration alleges that the plaintiffs by the acts or conduct of the defendant were deprived of and prevented from exercising their rights under their options, and that on the receipt of the notification from Bryan October 25, 1901, "it was then impossible for the plaintiffs to renew said options." It is a mistake to assume that it was incumbent on the plaintiffs to set out in the declaration mere matter of evidence for the purpose of explaining why the options were or were not in force, or potentially beneficial to the plaintiffs, at any particular time. The declaration is in case for the recovery of damages resulting from an alleged tort, consisting of acts and conduct on the part of the de-

fendant claimed to have been fraudulent. Although it refers to the contract of July 30, 1901, it is not based on that contract. It is true that it is alleged in the declaration that, if the defendant had acted in good faith toward the plaintiffs under that contract the latter would have received the sum of $97,959.99 by way of commission, at the rates specified in the contract, on the purchase or sale of certain properties mentioned therein. But these properties do not include all the phosphate lands and rights in phosphate lands referred to in the contract, or covered by the options of which the plaintiffs claim they were wrongfully deprived through fraud on the part of the defendant. While the amount which could have been realized under the contract of July 30, 1901, might under certain aspects of the case be evidence of the value of options held and owned by the plaintiffs, the statement on that subject in the declaration was wholly unnecessary and must be rejected as surplusage. It cannot, however, vitiate the pleading or render insufficient the other allegations of damage already discussed.

We now come to the principal and most difficult question in the case, namely, whether actionable fraud is set forth in the amended declaration. The contract of July 30, 1901, recites that "Bryan is desirous of examining said lands with engineers and experts to estimate to his satisfaction the quality or value of the phosphate rock thereon and the property included in said options with a view of determining if he will purchase such lands and properties or any of them." After reciting the above desire on the part of Bryan and the ownership by the plaintiffs of the options mentioned in the schedules, the contract provides not only that the plaintiffs "will afford to Bryan and his engineers and experts every opportunity that it may be possible for them to afford or reasonably obtain to make a full examination of all the properties covered by said options as said Bryan shall desire," but that in no event should the plaintiffs "exercise any of the options mentioned in any of the schedules hereunto annexed within ninety days from date hereof, except such options covering properties as Bryan may before the expiration of ninety days notify them that he does not care either to attempt to negotiate the purchase of directly or take under any Rogers and Gray option covering the same." The contract further provides for the payment by Bryan to the plaintiffs of commissions on the amount of the purchase price, if he should agree with the owner or owners of any one or more of the properties covered by the options to purchase the same either directly or indirectly, and should complete the purchase. It further provides that Bryan would "by competent engineer or engineers selected by him investigate each of the properties referred to in said options with all reasonable diligence", and if he should not "wish to acquire any property investigated" he would so notify the plaintiffs "on reaching that conclusion and they shall be at liberty to deal with said property and any option they hold thereon as if this contract had not been made." It further provides that if at any time within ninety days from the date thereof Bryan should elect to take an assignment of any of the options mentioned in the schedules the plaintiffs would assign to him any such option he should so elect, "it being understood that in the event of such an as-

signment of the option if the said Bryan shall thereafter elect to exercise the same" the compensation of the plaintiffs upon the purchase by him of the property covered by such assigned option should be the same as if Bryan purchased the property directly from the owner: And it further provides that if the plaintiffs should prior to January 1, 1902, acquire any options on other property they would at Bryan's election enter with him into "a similar agreement with respect to any such properties covered by such options as this agreement." It is difficult to conceive of a more improvident contract so far as the plaintiffs are concerned than that of July 30, 1901. By it they debarred themselves from the exercise of any of the options referred to in its schedules for a period not expiring until after the determination of all of them unless renewed or extended in point of time beyond their original limitation or except in so far as Bryan within that period should notify them that he did not care to negotiate the purchase of property covered by one or more of them. They bound themselves at the election of Bryan within ninety days to assign to him any of the options mentioned in the schedules, and to enter into a similar agreement with him touching any options which thereafter and until January 1, 1902, should be acquired by them. On the other hand, Bryan by the contract of July 30, 1901, practically bound himself to nothing which could or would be of advantage or benefit to the plaintiffs. By it he did not agree to purchase at any time the property covered by any of the options or to take an assignment of any of them; nor by it did he definitely undertake to notify the plaintiffs within the specified period of ninety days of any unwillingness on his part, after investigation by the engineer or engineers, to acquire property so investigated. It is true that by the contract he agreed to investigate the properties covered by the options with "all reasonable diligence" but, if he should not wish to acquire any property investigated, he was under an obligation so to notify the plaintiffs only "on reaching that conclusion." The mental act of reaching a conclusion might or might not occur prior to the expiration of the specified period of ninety days, and might well be impossible to establish by evidence. Even in case of an assignment to Bryan of any of the options he was obliged to pay compensation to the plaintiffs only if he should, after such assignment, "elect to exercise the same." Nor is there any provision in the contract requiring Bryan to acquire for himself or others any property covered by options or to take an assignment of any options or to pay any commissions or compensation to the plaintiffs, even if investigation by engineers should disclose that the property covered by such options was extremely valuable by reason of the presence of phosphate rock. In such case he could be bound only by his election to take such property, or an assignment of options and to exercise the same. The amended declaration does not disclose any breach of the contract of July 30, 1901, or any ground on which an action ex contractu could be sustained. It does not seek a recovery on the contract, nor its rescission on the ground of fraud. Nor does it otherwise attack the validity of the contract or aim at the doing of anything inconsistent with its terms. The declaration in question is purely ex delicto. The contract of July 30, 1901, is disclosed as an instrument employed in the successful accomplishment of a dishonest and

over-reaching scheme to the pecuniary injury of the plaintiffs. The contract appears only as an incident, though a necessary incident, to the commission of the fraud claimed to be charged against the defendant. It appears from the declaration that the defendant before and at the time Bryan and the plaintiffs entered into the contract, had an evil, wrongful and dishonest intent, for its own selfish ends, to deprive the plaintiffs of their options. It alleges that Bryan as agent and on behalf of the defendant, in order to secure the execution of the contract and for the purpose of securing control of the options and preventing the plaintiffs from disposing of them to persons other than the defendant, "falsely and fraudulently and with intent to deceive the plaintiffs represented to them that if they would execute said contract then the said Bryan, as agent of the defendant, would purchase the said lands and mining rights covered by said options, if the examination of said properties by his engineers should show that the said lands contained valuable deposits of phosphate rock, and would pay to the plaintiffs the commissions upon the purchase price thereof as set forth in said contract, if any of said properties should be purchased by said defendant company, either directly or indirectly." It further alleges that "the plaintiffs relying upon the said representations of the said Bryan executed the said contract". It further alleges in its concluding paragraph that the above representation by Bryan was "made in furtherance of a fraudulent scheme of the said defendant company to obtain control of the said options held by the plaintiffs during the entire existence of the same, to prevent the plaintiffs from negotiating and selling their rights under said options and the said properties and mining rights to persons other than the defendant, and to enable defendant to purchase said lands and mining rights directly from the owners thereof after the expiration of said options, without paying any commissions to the plaintiffs upon the purchase price of the said properties and rights covered by the said options as provided for in the contract heretofore mentioned, executed on July 30th, 1901." It appears from the declaration that on or prior to September 4, 1901, the engineer of the defendant examined and surveyed the property covered by the options held by the plaintiffs and estimated the amount of phosphate rock thereon pursuant to the contract of July 30, 1901, and that the "said surveys and examination showed that the said lands contained valuable deposits of phosphate rock and said lands actually contained deposits of phosphate rock of great value." On behalf of the defendant attention is called to the fact that while both the contract and the representation, on the strength of which it was entered into by the plaintiffs, refer to an examination and investigation of the property by Bryan's engineers, the only averment in the declaration touching the examination of the property states that it was made by the engineer of the defendant, and it is urged that it does not appear that the defendant's engineer was Bryan's engineer. Even were it material to consider this point in deciding the case on demurrer, it would be enough to say that the objection is without color or is at least hypercritical in view of the statement that all of the negotiations, contracts, transactions and acts of Bryan referred to in the declaration were carried on, executed and done by him "as agent for and on behalf of" the defendant. As-

suming that it is essential to the maintenance of this action of tort in the nature of deceit that there should have been a mala fide, deceitful and false representation, express or implied, on the part of the defendant of existing or past matter of fact, we think the amended declaration discloses such a representation, and that it was acted upon by the plaintiffs to their prejudice. The demurrer admits that the defendant through Bryan as its agent, in order to secure the execution by the plaintiffs of the contract of July 30, 1901, and for the purpose of depriving them of their options, and with intent to deceive them, falsely represented to them that, if they would execute the same, the defendant through Bryan would purchase the lands and mining rights covered by the options and pay the plaintiffs commissions if it were shown that such lands contained valuable deposits of phosphate rock. There is a prima facie presumption of fairness and honesty in the dealings of mankind, and, where one man makes a promise to another as an inducement for a change of position or other action on the part of the latter, he, if not expressly, impliedly avers that he has an existing intent to fulfill his promise, and such implied averment of existing intent is of matter of fact and, if false and fraudulent, is a fraudulent representation, which may or may not, according to circumstances, furnish the basis for an action ex delicto. The defendant, then, through Bryan falsely and fraudulently averred that in point of fact it had an existing intention to take the property covered by the options and pay commissions to the plaintiffs if there were valuable deposits of rock thereon; and upon this misrepresentation the plaintiffs relied in executing the contract of July 30, 1901. Yet it appears from the declaration, and is admitted by the demurrer, that the defendant in making the representation as an inducement to the execution of the contract, did not in fact have such an intent, but, on the other hand, had a precisely opposite intent; and that, with the exception of the Lockridge property, it never purchased any lands or mining rights under the contract with the plaintiffs. The inquiry at this point is not whether the representation made by the defendant would or could be material or admissible in an action founded on the contract. Doubtless it would be held incompetent as tending to add to or vary the terms of a written instrument. Nor is the point whether a fraudulent oral or parol representation, going merely to the consideration, and not to the execution, of the contract of July 30, 1901, as a sealed instrument, would be admissible in an action on that contract. The general rule is that "in an action upon a sealed instrument in a court of law, failure of consideration, or fraud in the consideration, for the purpose of avoiding the obligation, is not admissible as between parties and privies to the deed." Hartshorn v. Day, 19 How. 211, 222, 15 L. Ed. 605. But the inquiry is whether such a false and fraudulent averment of intent as was involved in the representation in question is not sufficient, other requisites existing, to support an action ex delicto in the nature of deceit. It went to the whole benefit or advantage to be expected or derived by the plaintiffs from their negotiations with the defendant with respect to the options. And such false representation, according to the case admitted by the demurrer, was part and parcel of a deceitful and fraudulent scheme or course of conduct on

the part of the defendant, including such representation as only one of its factors, contrived and practiced in the successful accomplishment of an evil and dishonest design wrongfully to deprive the plaintiffs of their rights under their options. The plaintiffs can have no remedy for the injury sustained by them in an action on the contract. If on the case as now presented they are not entitled to recover in an action ex delicto they are remediless. But we are not aware of any rule of law which can operate to bar the plaintiffs from redress in such a case. We think, on the contrary, that on well-settled principles they are, on the showing made by the amended declaration, entitled to recover, if sufficient particularity of averment has been observed in that pleading. In Edgington v. Fitzmaurice, 29 L. R. Ch. Div. 459, it was held that a false representation of the intention of the defendant in doing a particular act may be a fraudulent representation of fact on which, if the plaintiff was misled by it, an action of deceit may be maintained. There was a misstatement in the prospectus of a company of the objects or purposes for which money was to be raised by an issue of debentures. The court held, on dismissing an appeal from Denman, J., that an action of deceit would lie. Bowen, L. J., said:

"This is an action for deceit, in which the Plaintiff complains that he was induced to take certain debentures by the misrepresentations of the Defendants, and that he sustained damage thereby. * * * But when we come to the third alleged misstatement I feel that the Plaintiff's case is made out. I mean the statement of the objects for which the money was to be raised. These were stated to be to complete the alterations and additions to the buildings, to purchase horses and vans, and to develope the supply of fish. A mere suggestion of possible purposes to which a portion of the money might be applied would not have formed a basis for an action of deceit. There must be a misstatement of an existing fact: but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is, therefore, a misstatement of fact."

The other judges sitting in the case took the same view. In Johnson v. Monell, *41 N. Y. 655, it was held that it is not necessary, in order to establish fraud in the purchase of goods, that the purchaser should have made false statements concerning his pecuniary ability and have obtained credit accordingly; but that fraud may consist in the purchase with intent not to pay; and this intent may be proved by facts and circumstances as well as by affirmative declarations by the purchaser as to his pecuniary condition. The court through Peckham, J., said:

"There is no principle that will sanction a fraud in the purchase of goods, although the fraudulent purchaser was enabled to contract for and obtain possession of them without any false statement to the vendor. To my mind there seems to be an absurdity in holding that such false statement is the only evidence that can establish the fraud. That is the simple principle upon which alone such a decision can be based, and there is no such principle in the law. To establish such a fraud a party is no more confined to any particular kind or character of evidence than he is in any other case. He must prove the fraud to the satisfaction of the jury, by any competent evidence, and if he fail to make out a case sufficient to go to the jury without evidence of false representation at the time of the purchase, then he must give that evidence or be nonsuited. To avoid the sale as fraudulent the jury must be sat-

isfied, by the proof, that the purchaser intended, by the purchase, to defraud the vendor; that he never intended to pay for the goods. That proof will differ necessarily in practice as much as the conduct of men varies. To hold that affirmative misrepresentation is indispensable to avoid a sale is to declare that that is the only mode in which a fraudulent purchase can be made, that all others are honest and legal."

In Stewart v. Emerson, 52 N. H. 301, the court held that, when one intending not to pay for goods induces their sale on credit by fraudulently representing or causing the owner to believe that he intends to pay for them or by fraudulently concealing the intent not to pay, a debt is created by fraud. In the course of a forcible and elaborate opinion Doe, J., said:

"The substance of a contract is a mutual understanding, existing in fact or in contemplation of law. A contract of sale, from B to A, completely performed, is their mutual understanding, executed by the delivery of the goods and the payment of the price. The understanding is, that A is to acquire the possession and ownership of B's goods, and to pay for them. Without a' mutual understanding that A is to pay for them, there is no sale. If both parties understand there is to be no payment, the transaction is a gift, and not a sale. If B understands there is to be payment, and A understands there is to be no payment, it is neither a sale nor a gift, and the title does not pass, because there is no mutual understanding, unless a case of estoppel can be made out by one party against the other. When A so conducts as to intentionally cause B to understand that A is a purchaser, or, in other words, that the transaction is a sale, he necessarily causes B to understand he intends to pay, because a sale or purchase necessarily implies payment or an intent to pay. If he acts in bad faith, intending never to pay, and, therefore, the understanding is in fact not mutual, still B could maintain an action on the contract, because A would be estopped to deny that his understanding and intent were what he induced B to understand they were. Having, by his words or conduct, wilfully caused B to believe the existence of a certain state of facts, and induced him to act on that belief so as to alter his previous position by parting with his goods, A is concluded from averring against him a different state of things as existing at the same time. Davis v. Handy, 37 N. H. 65, 75. This estoppel B may set up against A. But he is not obliged to set it up. He may take the ground that, there being in fact no mutual understanding, no meeting or agreement of minds, no harmony of intention, no joint assent to the same thing, there was no contract. And when he takes that ground, it may be said that the validity of the sale is affected by the mere mental state of the parties, or it may be said that there was no sale to be affected by the mental state of the parties. In this analysis, the entire contract falls to pieces and disappears, and the transaction, resolved into its original and real elements, becomes a wrongful and fraudulent conversion of B's goods by A. And when B may allege that the contract or the debt was created by the fraud of A, he may sustain his allegation by proof of facts which would show that by reason of A's fraud there would have been no contract and no debt, if B had chosen to take that ground. The intent to commit a fraud is not the commission of a fraud; but when A, in the assumed character of a buyer, animo furandi, obtains goods of B on credit by the concealment of such a material fact as an intent not to pay—a fact peculiarly within his own knowledge, and impossible to be discovered by B—the fraudulent part of the transaction cannot be reduced to the fact concealed, the intent not to pay. The concealment of that fact is fraudulent. B has lost his goods: that is a serious part of the business. * * * The fraudulent part of all this cannot be called a mere intention or state of the mind. The condition of both parties is substantially changed by means of the fraudulent concealment. B has lost his goods, and A has obtained them without any valuable consideration. * * * An intent to commit a fraud is not a fraud committed—but the question is, whether obtaining goods and credit under color of a pretended purchase by concealing an intent not to pay for

them is a fraud committed, or whether in such an affair there is nothing fraudulent but an unexecuted intent to commit a fraud. If the intent not to pay were the only fraudulent intent, it might be claimed that the only intended fraud would not be committed till the time of payment arrived. But the fraudulent design of which B complains is the intent of A to get goods without payment, and by fraudulent concealment. That intent is executed the moment A gets the goods. No overt act remains to be done by him to complete the artifice practiced upon B. * * * But the fraudulent design is not merely negative—not to pay at a future time; it is also affirmative—to obtain the goods and the credit by the concealment of the material fact of the intention not to pay. This concealment is not a mere fraudulent intent: it is the execution of a fraudulent intent and the commission of a fraud, if a fraud can be committed by the concealment of a material fact. * * * What principle of law requires a false and fraudulent representation to be expressed, or forbids it to be fairly inferred from the act of purchase? A representation of a material fact, implied from the act of purchase, and inducing the owner of goods to sell them, is as effective for the vendee's purpose as if it had been previously and expressly made. If it is false, and known to the pretended purchaser to be false, and is intended and used by him as the means of converting another's goods to his own use without compensation, under the false pretense of a purchase, why does it not render such a purchase fraudulent? When the intent is to pay, it is necessarily understood by both parties, and need not be expressly represented as existing. When the intent is not to pay, it is of course concealed. Whether the deceit is called a false and fraudulent representation of the existence of an intent to pay, or a fraudulent concealment of the existence of an intent not to pay, the fraud described is, in fact, one and the same fraud. A man obtains goods on credit by fraudulently representing (that is, fraudulently causing their owner to understand) that he intends to pay for them; or, he obtains them by fraudulently concealing his intent not to pay for them; if he obtains them in either way, he obtains them in both ways."

In Pennsylvania possibly more than in any other state there has been a judicial inclination to uphold a purchase of property as not being fraudulent, notwithstanding an intention at the time of the purchase on the part of the purchaser never to pay. The unsoundness and impropriety of such a course have, however, met with severe condemnation at the hands of the Supreme Court of that state. In Bughman v. Bank, 159 Pa. 94, 28 Atl. 209, the court through Mitchell, J., said:

"In Smith v. Smith, 21 Pa. 367 [60 Am. Dec. 51], it was held that even an intention by an insolvent buyer at the time of the purchase not to pay, will not amount to a fraud, unless some false representation, trick, or artifice, or conduct which involves a false representation, be added. The law as thus declared was not in harmony with that of a majority of other states, nor with sound policy or the principles of business honesty. It was moreover a departure from the previous decision of this court in Mackinley v. McGregor, 3 Whart. (Pa.) 369, where it was expressly held (page 396 [31 Am. Dec. 522]) that whatever may be the limitation of the right of the vendor as against other persons into whose hands the goods may have come, 'it is certain as a general principle that when a person purchases goods with a preconceived design of not paying for them, it is a fraud, and the property in the goods does not pass to the vendee.' This seems to us much the sounder doctrine. * * * A purchase with a present intent not to pay is a rank fraud in morals, and should be so pronounced in law. The departure that was made in Smith v. Smith is therefore much to be regretted. It was not made by a unanimous court, nor has it ever received the unmixed approbation of the bench or the bar. But it has been expressly followed in several cases, and has remained in the books without being overruled, for forty years, and recognizing that the subject is one on which legal minds have always been apt to differ, we do not think it wise now, notwithstanding our own clear convictions on the princi-

ple, to unsettle the law by another change. We will, therefore, stand on the authority of Smith v. Smith and its kindred cases, but we will not go a step beyond what they require. Any additional circumstance which tends to show trick, artifice, false representation, or, in the language of Smith v. Smith itself, 'conduct which reasonably involves a false representation,' will be sufficient to take the case out of the rule of those authorities."

Ayres v. French, 41 Conn. 142, is an instructive case in this connection. It was decided on demurrer to a declaration in trover, the second count of which set forth a fraudulent procurement and conversion of shares of corporate stock belonging to the plaintiff. That count, together with the others, was held sufficient, the Supreme Court of Errors through Park, C. J., among other things, saying:

"The ground of complaint set forth in this count is the conversion of the property by the defendant. The remaining allegations contain merely a statement of the means employed by the defendant to obtain possession of the property, in order that he might carry into execution his preconceived intention to convert it to his own use. The count sets forth all the facts and circumstances with great particularity, but the substance of it is that the defendant, knowing the pecuniary condition of the plaintiff, devised the scheme therein stated to obtain the stock of the plaintiff, and then convert it to his own use; which scheme was successfully carried out and the conversion accomplished. The count contains all the essential averments of an action of trover, aggravated by the deception used to obtain possession of the property. It states that the stock belonged to the plaintiff; that it was placed in the hands of the defendant as collateral security for certain indorsements made by the defendant for the benefit of the plaintiff; that the obligations on which the indorsements were made were paid and satisfied by the plaintiff, and the defendant had no longer a right to retain the stock; and that the stock was afterwards demanded, and the defendant refused to deliver it, and disposed of and converted the same to his own use. These allegations certainly are sufficient to sustain an action of tort, if we are right in the views we have expressed in relation to the first count in this declaration. But the defendant claims that nothing appears in this count but a breach of contract. He insists that to constitute fraud a party must make a false statement as to some material existing fact, knowing it to be false. This is not necessary in all cases of fraud. If a vendor intentionally conceals from the vendee a material latent defect in a horse which he is selling, and the sale is made; or if he should say that the horse was sound so far as he knew, when he knew him to be unsound, and the unsoundness consisted in a latent defect which impaired his value, he would be guilty of fraud. 1 Swift's Digest, 554. So if a man purchases goods with a preconceived design not to pay for them, he is likewise guilty of fraud. * * * It is alleged in this count that the defendant, in order to induce the plaintiff to give up his claim against the corporation and take stock in lieu thereof, informed the plaintiff that he would indorse his paper without further compensation and without security, intending at the same time not to do it, but to demand security when the time should come, in order to compel the plaintiff to put his stock into his hands; and intending further, when this should be done, to appropriate the stock to his own use. It is alleged that the defendant was successful in his scheme of depriving the plaintiff of his property and in converting the same. The contract is not set out as the basis of recovery, but as the means whereby the defendant accomplished his original purpose to convert the property. It is the dishonesty in making the false promises in furtherance of his scheme of fraud, that is the basis of the action, in connection with the conversion of the property. * * * It would seem that if a man is guilty of fraud in the purchase of goods when he has a secret intention not to pay for them, much more is he guilty of fraud if, after he devises a scheme for getting possession of the property of another without buying it, and appropriating it to his own use, he goes deliberately at work to carry his scheme into execution by making promises with the intention at the time not to fulfill them, and breaks them

149 F.—2

as often as they are made in accordance with his original intention, and so goes on to the consummation of his plan. Where lies the fraud in buying goods with an intention not to pay for them? It lies in the fact that the fraudulent purchaser gives the seller to understand that his intention is to pay for them. His deceit therefore is in his statement with regard to his intention. Here the defendant promised the plaintiff that he would indorse his paper without further compensation and without security. It is charged that that promise was made with the intention not to fulfill it. The defendant further promised the plaintiff that the property should be returned when he was saved harmless from his indorsements. It is charged that that promise was made with no intention to keep it, but with the intention to convert the property to his own use. We have no hesitation in saying that an actionable fraud is charged in this count."

In Dowd v. Tucker, 41 Conn. 197, a bill had been filed to compel the conveyance of certain real estate which a testatrix had intended to devise to the petitioner by a codicil to her will and which she was dissuaded from so devising by the respondent, to whom all of her property, in the absence of such a codicil, would go under her will. Park, C. J., here also delivering the opinion of the court, said:

"This case is clearly one of fraud. We have held on the present circuit [Ayres v. French, 41 Conn. 142] in accordance with numerous decisions, that whosoever buys personal property with a preconceived intention not to pay for it, is guilty of fraud. This case is similar in principle. It matters but little whether the property is real or personal estate. Whosoever buys real estate with a preconceived secret intention not to pay for it, but to cheat the grantor out of it, is as much guilty of fraud as he would be if the property was personal estate. Apply this principle to the case we have in hand. The property in controversy belonged to Frances M. Hayden, and while it was yet hers to be disposed of as she pleased, she informed the respondent that she desired to give it to the petitioner if he was willing, and asked him if he was willing, again expressing her desire to give it. A codicil to her will had been at this time prepared and lay before her ready to be executed. The respondent knew by the inquiry and by the preparation what her purpose was. She had previously, by a duly executed will, given all her property to the respondent. He knew now that she had changed her mind, and was about to give the real estate in question in legal form to the petitioner, but that she desired his consent to the change, if it could be obtained. He immediately resorted to deception. He substantially expressed his entire assent to the change, but suggested the mode in which it would best be accomplished in her weak condition. He said in effect, let me take the property, as you have already willed it to me, and when it comes into my hands I will deed it to the petitioner, and in that way your present desire with regard to the disposition of the property will be carried out, as much as it would be by executing the codicil; therefore in your weak condition do not trouble yourself about it. She was satisfied that the petitioner would have the property in the way proposed, and so expressed herself, and consequently the codicil was left unexecuted; or, in other words, she let him have the property on his promise to convey it to the petitioner. * * * It is the case of one obtaining the conveyance of property by a promise, which he has no intention at the time to fulfill."

In Laing v. McKee, 13 Mich. 124, 87 Am. Dec. 738, a bill was brought to compel the defendant to convey to the complainant certain lands which had been bought by the former at a tax sale. The complainant, having a right to redeem, allowed the time for redemption to expire without exercising his right, on the strength of an oral agreement by the defendant to assign to him the certificate of sale on receiving from him the amount of the bid at the tax sale together with interest and the expense of the acknowledgement. This undertaking

the defendant refused to observe. It was objected by him that the agreement was a parol contract relating to land and therefore void under the statute of frauds. The court, through Cooley, J., said:

"We do not think this case is to be put on the ground of specific performance solely. The facts charged and established show that complainant, relying upon the promise of defendant to assign, neglected to exercise his legal right to redeem, and defendant was thereby enabled to obtain a deed of the lands. It sufficiently appears that complainant would have made the redemption but for the assurances thus made to him, and a fraud has thus been perpetrated upon him, against which he is entitled to relief. It is a matter of no moment whether the fraud was perpetrated by means of a promise upon which he relied, and which the defendant did not intend to keep, or by untrue statements as to existing facts. And it is not necessary for us to decide, in this view of the case, whether the agreement to assign the certificate was or was not void under the statute of frauds."

The doctrine of Laing v. McKee was approved in Wilson v. Eggleston, 27 Mich. 257. Butler v. Watkins, 13 Wall. 456, 20 L. Ed. 629, strongly supports the contention of the plaintiffs, although the points decided did not arise on demurrer. Butler held one or more patents for a machine for fastening bales of cotton, known as the "Butler Cotton-tie," and had negotiations with Watkins, the general manager of an English manufacturing company, looking to an arrangement by which the company should manufacture cotton-ties under Butler's patent or patents during the year 1868, the latter to receive a share of the proceeds of sale. The negotiations were not brought to a definite conclusion, but were protracted in bad faith and deceitfully by Watkins and the company, as was alleged in the complaint, until it was too late for Butler to make any other arrangement for the manufacture and sale of cotton-ties during that year, whereby the plaintiff suffered damage through having his cotton-ties kept during that time out of the market. It was further alleged that the doings of Watkins and the company were the purpose of gaining control of the Butler cotton-tie for 1868 in order to keep it out of the market, and by that means to promote the sale of certain other cotton-ties in which Watkins and the company were largely interested. Butler sued to recover for the fraud practiced against him. The court through Mr. Justice Strong said:

"It is quite true that the suit was not brought upon any contract. The theory of the plaintiff was that no agreement had ever been made, and that the defendants had never intended making one, though all the while during the negotiation, deceptively and fraudulently holding out to the plaintiff a profession of intention to conclude an agreement, and that this was done with the purpose of keeping the plaintiff's 'cotton-tie' out of the market. * * * It does not follow, because the corporation never authorized or sanctioned a contract, that they may not be responsible for such a fraud as was alleged in the petition. We have not all the evidence before us, but it does appear that some evidence was given tending to show that the acts and conduct of the defendants (Watkins and the corporation), were deceitful and fraudulent, designed to mislead, and done for the purpose of keeping the plaintiff's cotton-tie out of the market, in order that they might secure heavy sales of the Beard tie, in which they were largely interested. If the evidence did establish or tended to establish such deceit and fraud, for such a purpose, and if the plaintiff was injured thereby, as his petition alleged, it was erroneous to charge the jury that the suit could not be maintained. Competition in efforts to secure the market is doubtless lawful. A manufacturer may by

superior energy, or enterprise, supply all the buyers of a particular article, and thus leave no market for similar articles manufactured by others. But he may not fraudulently or by deceitful representations induce another to withhold from sale his products without being answerable for the injury occasioned by the fraud. Whether negotiations for a purchase never concluded were in fact fraudulent; whether they were commenced and continued solely with the purpose of dishonestly inducing the plaintiff to forego offering his goods until the market had been supplied, and whether such was the consequence of the defendants' fraudulent conduct, were questions of fact which should have been submitted to the jury on the evidence. If answered affirmatively, the action was sustainable. In order to maintain an action for fraud it is sufficient to show that the defendant was guilty of deceit, with a design to deprive the plaintiff of some profit or advantage, and to acquire it for himself, whenever loss or damage has resulted from the deceit."

Here the demurrer admits that the plaintiffs, relying upon a false representation by the defendant, were thereby induced to enter into the contract of July 30, 1901, by which they placed themselves at its mercy, and that both the representation and contract were resorted to by the defendant as means whereby the plaintiffs should be wrongfully deprived of their rights under their options. When entering into that contract, the defendant had no intention fairly to exercise the election thereby conferred upon it to effect the purchase or sale of phosphate lands and rights under the plaintiffs' options, but had a directly contrary purpose; and in order to effectuate that evil design resorted to the oral or parol undertaking involving a false representation of its then existing intention. As before stated, the plaintiffs in their amended declaration do not proceed on the contract, but for the tort, and it cannot avail the defendant that the false representation cannot be treated as part of the contract. If fraud has been alleged with sufficient particularity, we do not doubt that, whatever may be its final outcome, the case as made by the declaration discloses justiciable and actionable fraud. On the alleged insufficiency of the declaration, in point of particularity we have but little to say. While the allegations of fraud in some respects are not as formal as may be desirable we regard them as sufficient. It is true that the mere use of adjectives importing fraud or deceit cannot be permitted to supply the place of the essential facts constituting the fraud or deceit relied on. But an impracticable standard of particularity is no more required in allegations of fraud than in an indictment. Mere matter of evidence is not required to be stated. In the amended declaration all the facts constituting the fraud are, though somewhat informally, plainly alleged, and the defendant is fully advised of the case it is called on to meet.

We think there was error in sustaining the demurrer to the amended declaration. The judgment below is, therefore, reversed, with costs in this court, and with directions to the court below to enter a judgment overruling the demurrer and requiring the defendant to answer over.