WRIGHT v. BARNARD et al.

(District Court, D. Delaware.   November 7, 1917.)

No. 338.

1. ESTOPPEL ⬷83(1)—CONTRACTS—FALSE REPRESENTATIONS.
Officers of a corporation, who in contracting with complainant falsely
represented that they owned and controlled all of the stock and thereby
induced action on the part of the complainant, who in good faith relied
upon the truth of the same, were estopped to deny such ownership and
control, or that, being a majority of the directors, they had power to
secure a proposed amendment of the charter, and to cause to be done all
other things to be done on the part of the company.

2. CORPORATIONS ⬷428(12)—OFFICERS—FRAUD—NOTICE—IMPUTING TO COR-
PORATION.
Where the vice president and the secretary and treasurer of a corpora-
tion were sons-in-law of the president, who was old, feeble, and of im-
paired faculties, and the three officers, with the wife of one of them, own-
ed all of the stock, and such two officers conducted its business, it was
chargeable with knowledge of the fraud practiced by them on complainant
in contracting with him to remain in its employ.

3. CORPORATIONS ⬷426(1)—LIABILITY FOR FRAUD OF OFFICERS—RATIFICA-
TION.
A contract by officers of a corporation respecting the amendment of
its charter and salaries of its officers, the enlargement of its operations,
and other matters affecting its interests, related to its business and af-
fairs, and not to their private or individual interests, and it became lia-
ble with them for its consequences by ratifying and adopting the agree-
ment with knowledge of fraud practiced by the officers on the other party
to the contract.

4. CORPORATIONS ⬷306—OFFICERS—RATIFICATION—PERSONAL LIABILITY.
The ratification or adoption by a corporation of an agreement of its
officers could not shield them from responsibility for the consequences of
their own fraud in connection therewith.

5. CORPORATIONS ⬷426(6)—CONTRACTS OF OFFICERS—RATIFICATION—NECESSI-
TY OF FORMAL ACTION.
If the continued course of action of a corporation, through its officers
and agents, with knowledge of which it was chargeable, was consistent
only with an adoption of an agreement of its officer on its behalf, it
ratified the agreement, though no ratification or adoption was disclosed
by its minutes.

6. CORPORATIONS ⬷319(7)—CONTRACT—FRAUD—EVIDENCE—SUFFICIENCY.
Where officers of a corporation, who owned less than a majority of the
stock, contracted with the complainant that he should remain in its em-
ploy, agreeing to have the amount of stock increased, and to give him the
ownership of part of the stock on certain conditions, falsely representing
that they owned and controlled all of the stock, evidence held to show
that they made no bona fide attempt to have the charter amended.

7. CONTRACTS ⬷169—CONSTRUCTION—SURROUNDING CIRCUMSTANCES.
To ascertain the real intention of the parties to a contract containing
expressions reasonably susceptible of more than one interpretation, the
situation and surrounding circumstances may be considered.

8. CORPORATIONS ⬷319(7)—CONTRACT WITH MANAGER—BREACH—PRESUMP-
TIONS.
Where officers of a corporation in December, 1911, contracted with
the complainant that he should remain in its employ, agreeing to increase
the stock and place a part in escrow for him, but made no bona fide at-

tempt to do so, it will be presumed, as against them and the company as wrongdoers, that but for their nonobservance of the agreement complainant would have been as contemplated in the agreement general manager of the company under an amended charter and entitled to dividends on the agreed part of the stock prior to July, 1912, when the agreement was modified.

9. CORPORATIONS ⬪316(1)—STOCK—CONTRACT WITH MANAGER—"LIQUIDATED."

Under a modified contract, providing that, when the debts of a corporation for 1912, as shown on the last day of that year, were liquidated, the stock would be increased, and one-third thereof placed in escrow for complainant, who was to be general manager, the word "liquidated" meant paid, and not merely ascertained, though generally it might have either meaning.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Liquidated.]

10. CORPORATIONS ⬪316(1)—STOCK—CONTRACT WITH MANAGER—"DEBTS OF THE COMPANY FOR 1912."

The "debts of the company for 1912," within such contract, were the debts incurred in that year in the course of its ordinary business, and not debts for the erection, enlargement, or multiplication of the company's plants.

11. CORPORATIONS ⬪316(1)—STOCK—CONTRACT WITH MANAGER—PERFORMANCE.

It was the duty of the company to pay the indebtedness for 1912 before expending large amounts for the construction and enlargement of its plants, and, where these debts might have been paid the failure to pay them was fraud on complainant, of which the corporation or its officers could not take advantage.

12. CORPORATIONS ⬪316(1)—STOCK—CONTRACT WITH MANAGER—"DEBTS FOR THE YEAR 1912."

An indebtedness existing in the preceding year did not constitute "debts for the year 1912," within the contract.

13. CORPORATIONS ⬪316(1)—CONTRACT WITH MANAGER—ABANDONMENT OF EMPLOYMENT—FORFEITURE OF RIGHTS.

Where complainant was employed by a corporation under an agreement that the stock was to be increased and part placed in escrow for him on certain conditions, but the corporation and its officers fraudulently omitted to amend the charter or set apart stock for plaintiff, took business properly belonging to one in his position out of his hands, made repeated efforts to induce him to surrender his agreement and declared it valueless and failed to pay his salary, he was justified in leaving the company's service, and forfeited none of his rights by so doing.

14. EVIDENCE ⬪590—TESTIMONY OF PARTY TO FRAUD.

Fraud in fact is an acted lie, and the testimony of a party to the fraud touching the fraudulent transaction, when uncorroborated and given in his own interest, cannot avail against the inherent probabilities of the case.

15. CORPORATIONS ⬪319(2)—CONTRACT WITH MANAGER—EQUITABLE JURISDICTION—FRAUD.

Officers of a corporation contracted with the complainant that he should remain in its employ, agreeing that stock would be increased and a part placed in escrow, to become complainant's property when he had increased the earnings to a specified amount, but falsely represented that they owned all of the then existing stock, and made no bona fide attempt to amend the charter to provide for such stock increase, and subsequently took out of his hands business properly belonging to one in his position, endeavored to induce him to surrender the agreement, declaring it valueless, failed to pay his salary, and later increased the stock under an arrangement with third parties, who were permitted to subscribe for the additional stock,

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

thereby depriving complainant of the opportunity of acquiring any portion of the stock, or of receiving the dividends on the agreed portion of the stock. *Held*, that equity had jurisdiction of a suit for relief, especially in view of equity rule 23, prescribed by the Supreme Court.

16. DAMAGES ☞163(1)—EVIDENCE—PRESUMPTIONS.

Presumptions of damage or loss of gain are indulged as against wrongdoers; but they must be reasonable, and have relation to loss or damage which there is a reasonable probability would not have occurred, had not the wrong been committed, and they do not exist with respect to purely speculative or remotely possible loss.

17. TRUSTS ☞334—ESTABLISHMENT AND ENFORCEMENT—GROUNDS.

Where a contract provided that a corporation's stock should be increased, and one-third placed in escrow for the complainant, who was to be the general manager, and to become owner of such stock when he had increased the earnings to a specified amount, but he was wrongfully deprived of the opportunity to earn the stock, a trust could not be impressed on one-third of the company's stock, and its delivery decreed; it not appearing that the company had any treasury stock, and it being conjectural whether the complainant would have succeeded in increasing the profits.

18. INJUNCTION ☞118(5)—SUITS FOR INJUNCTION—PLEADING—PRAYER

A prayer that the selling or incumbering of the corporation's property, in violation of complainant's rights be restrained, was too vague and indefinite to be enforced.

19. EQUITY ☞427(3)—RELIEF—PRAYER FOR GENERAL RELIEF.

Under the prayer for other and further relief, complainant was entitled to such relief as was consistent with the case as made by the pleadings and the evidence.

20. CORPORATIONS ☞319(½)—STOCK—BREACH OF CONTRACT—DAMAGES.

It being a reasonable presumption, founded upon a reasonable probability, that if the contract had been carried out one-third of the stock would have been placed in escrow the dividends on which were to be received and enjoyed by complainant, he was entitled to recover the dividends which the failure to carry out the agreement prevented him from receiving.

21. CORPORATIONS ☞38—CHANGE OF IDENTITY—AMENDMENT OF CHARTER.

An amendment of the charter of a corporation to provide for an increase of stock would not have affected the identity of the company.

22. FRAUD ☞12—PROMISE WITHOUT INTENTION OF PERFORMING.

The signing of an agreement by officers of a corporation, providing for increasing the stock and placing part in escrow for complainant, amounted to a representation of fact that they then intended to do this, and such intention not existing, they were guilty of false representation of fact.

23. CORPORATIONS ☞316(1)—STOCK—CONTRACTS—CONSIDERATION.

Where a contract, as modified, provided that the stock of a corporation should be increased, and equally divided between the complainant and officers of the corporation, complainant's stock to be placed in escrow until the earnings had been increased to a specified amount, and complainant had been working for the company under the original contract for six months prior to the making of the modification, which recognized the validity of the original agreement, the services rendered or to be rendered by complainant constituted ample consideration to support the agreement as modified.

24. CORPORATIONS ☞319(½)—STOCK—BREACH OF CONTRACT—DAMAGES.

Where a contract under which the complainant was employed by a corporation provided that the stock should be increased from $100,000 to $150,000, and that one-third should be placed in escrow for him, subject to certain conditions, and the corporation failed to make the increase, or to give him an opportunity to earn the stock, and subsequently increased the stock to $200,000, issuing the additional stock to third persons, one-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

third of the original capital stock must be taken as the basis for the computation of the dividends measuring complainant's damages.

25. WITNESSES ☞130—COMPETENCY—TRANSACTIONS WITH DECEDENT.

Under Rev. St. § 858. amended by Act June 29, 1906, c. 3608, 34 Stat. 618 (Comp. St. 1916, § 1464), providing that the competency of a witness shall be determined by the laws of the state, and Rev. Code, Del. 1915, § 4212, providing that, in actions by or against executors in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with the testator, complainant could testify to a transaction with a deceased officer of a corporation as the basis for a decree against the corporation, though the officer's estate owned stock, as a decree against it would not be a decree against the executrix.

In Equity. Suit by Herman L. Wright against Cynthia E. Barnard, executrix of Remsen C. Barnard, deceased, and others. Decree for complainant in accordance with the opinion.

See, also, 233 Fed. 329.

Andrew E. Sanborn and John W. Huxley, Jr., both of Wilmington, Del., for complainant.

Robert H. Richards, of Wilmington, Del., and William M. Hope, of Dover, Del., for respondents.

BRADFORD, District Judge. Herman L. Wright, of New York, brought his bill against Cynthia E. Barnard, Executrix of Remsen C. Barnard, William Pennewill and the Stetson & Ellison Company, hereinafter referred to as the canning company or the company, charging fraud and breach of contract against Barnard, Pennewill and the canning company, and praying sundry relief against them as hereinafter mentioned. It appears from the evidence that the canning company was incorporated December 22, 1904, for the purpose, among other things, of canning and preserving fruits, vegetables, meats, &c., with a capital stock of $100,000, divided into 1,000 shares of $100 each. In the certificate of incorporation there was no provision for preferred stock. The original subscribers and incorporators were William Ellison, Barnard and Pennewill, the two latter being sons-in-law of Ellison. These three men composed the board of directors. Ellison became president, Pennewill vice president, and Barnard secretary and treasurer of the company.

In May, 1910, the complainant became connected with it. He wrote April 29, 1910, to the company suggesting that there was a plan by which from 25% to 30% more profit could be made on its output of canned goods, referring to his experience in selling and advertising to the wholesale and retail grocery trade, and indicating his desire to have a personal interview on the subject. Such an interview was promptly had with Barnard, the secretary and treasurer, who went to Philadelphia for that purpose, and in the early part of the following month, without any formal written contract, the complainant was employed by the company for the balance of that year for the salary or compensation of $300 a month in order that the efficacy of his suggested plan might be tested. This arrangement having been made, the

complainant opened an office in the city of New York at No. 105 Hudson Street. At the time of his employment by the company approximately 40,000 cases of canned tomatoes were in storage, being an unsold surplus of the last year's product. He rendered such active and efficient service as to dispose not only of the product of 1910, but of the above mentioned surplus. His work having proved satisfactory to the company, it was decided late in the fall of 1910 to secure his services for the year beginning December 1, 1910, and ending December 1, 1911, on a basis materially different from that on which he had served the company in 1910. An arrangement was accordingly made between the company and him embodied in a letter written by him to the company November 25, 1910, and endorsed by it in the following words:

"Correct: Stetson & Ellison Co. Per R. C. Barnard, Sec. & Treas."

The portions of the letter material in this connection are as follows:

"This is to confirm the arrangement agreed upon for the maintenance of the New York office from December 1st, 1910, to December 1st, 1911, substance of which is as follows: That $6,000.00 is to be allowed me during this period for my work on gallon (#10) tomatoes and tomato pulp, this sum to cover the expenses of maintaining the sales offices here in New York, which shall include rent, stenographer, and incidental expenses. * * * Expenses outside of the maintenance of the New York office, such as advertising, salesmen, traveling expenses, etc., etc., are to be paid by Stetson & Ellison Co., but no such expenses are to be incurred without their consent. Remittances are to be made to me on the 1st and 15th of each month, the amounts of same dependent upon what is needed by me at this end. Final settlement of the year's work to be made at a date to be agreed upon."

It appears from the evidence that the "expenses of maintaining the sales offices here in New York" were insignificant in amount as compared with the $6,000 allowed him for his work, falling short of $100. The complainant served the company faithfully and efficiently during the year agreed on, from December 1, 1910, to December 1, 1911, and received December 21, 1911, from the company, and receipted for, a check for $1,869.27, being balance in full of the stipulated salary or compensation of $6,000 and his commissions on sales of tomatoes.

About or shortly before the time of the expiration of the last mentioned agreement with the complainant, it being necessary that a further arrangement should be had with him to secure his services for the future, the matter was taken up by him with Barnard and Pennewill who went to New York to discuss the situation for 1912. The conference continued for several days. It appears from the evidence, direct and circumstantial, that Barnard and Pennewill recognized that the complainant had secured good results in 1911, and desired that the company should have the benefit of his services thereafter for the enlargement of its business. The complainant, however, was unwilling to continue to serve the company on the same basis which he viewed as "more or less of a salary and commission proposition," and he so informed Barnard and Pennewill, who agreed that if the sales could be largely increased by him he would be entitled to have a part or share in the business of the company. Finally a decision was reached that,

to use the language of the complainant on the stand, "the business should be split into thirds; in other words, that we should all go in on an equal basis; get together and strive to pull the business up and to share the profits equally." With respect to the raising of the requisite amount of money for the proposed enlargement of the business, it was suggested and concluded by those present that the same could be secured through preferred stock, or an issue of bonds, or borrowed from the bank. After the discussion of some further details of the proposed change the complainant secured the services of Arthur Rowe, an attorney at law, who met him and Barnard and Pennewill at the Wool Club in New York. The evidence does not disclose any act, statement or conduct on the part of Barnard, Pennewill or the company, prior to this meeting at the Wool Club, on its face suggestive of a fraudulent or unfair intent toward the complainant or in the least inconsistent with an observance by them of entire good faith. He was not aware of anything calculated to beget in him the slightest suspicion of fraud or bad faith on their part. He, relying, unconsciously it may be, upon the presumption of honesty and fair dealing in business transactions, assumed and had a right to assume that he was negotiating with straightforward and honorable men. But the evidence of what transpired at the Wool Club, and subsequently up to and including December 19, 1911, between Barnard and Pennewill and the complainant, renders it impossible to reconcile the conduct of the two former with the rules of fair and honest dealing. It is established by the documentary and oral evidence and is wholly beyond controversy that during all that time the 1,000 shares of the capital stock of the company were held and owned as follows: Barnard 330 shares; Pennewill 20 shares; Katherine E. Pennewill, his wife, 480 shares; and William Ellison 170 shares. Thus Barnard and Pennewill together held and owned but 350 shares as against 650 held and owned by others,—only slightly over one-third of the total capital stock. Rowe testified to the effect that at the conference at the Wool Club Barnard and Pennewill told him they were the owners of all the capital stock of the company. He further testified as follows:

"They discussed the situation of the Stetson and Ellison Company; they said that it was a corporation with one hundred thousand dollars of common stock, and that Mr. William Penniwell and Mr. R. C. Barnard were the owners of the common stock; that Mr. Wright had for some time been connected with the company as sales agent, and had proved his value to the company by increasing the net returns of company. Mr. Barnard said that Mr. Wright was so valuable to the company that they wished to retain his services, and Mr. Wright explained that the goods put up by the company were very good, and that was, in part, the reason for his success in selling the goods; they told me that they wished the company reorganized in such a way that Mr. Wright would be entitled to one-third of the proceeds of the business."

And further, that as a result of the conversation at the Wool Club the witness prepared two paper writings, (Complainant's Exhibits 71 and 72,) being proposed agreements between Pennewill, Barnard and the complainant, relative to the business and affairs of the company. The first recital in the preamble in Exhibit 71 is as follows:

"Whereas, William Penniwell and R. C. Barnard, are each the owner of $50,000 of the stock of Stetson & Ellison Co., which corporation is engaged in the canning business."

Exhibit 72 contains nothing inconsistent with the above recital. It appears that these proposed agreements were received from Rowe by the complainant through the mail on the day next after the conference at the Wool Club, and were personally delivered by him to Barnard and Pennewill, who took them to Delaware for the expressed purpose of taking up the matter with Ellison, the president of the company. The complainant received December 18, 1911, a letter, dated the preceding day, from the company bearing its typewritten signature, but in fact prepared and emanating from Barnard, in which it was stated, among other things, that:

"We have had our conference with Mr. Ellison which has ended as we predicted, 'Well, go ahead boys, I leave it to you.' "

The proposed agreements prepared by Rowe were submitted by Barnard and Pennewill to an attorney in Dover, Delaware, who prepared in lieu of them a proposed agreement which was subsequently signed by Wright, Barnard and Pennewill December 19, 1911, as follows:

[The contract was here quoted in full.]

It will be observed that, contrary to the fact, the first recital in the preamble declares that Pennewill and Barnard "own and control the capital stock of Stetson and Ellison Company," and that in the third paragraph the agreement provided that 1,500 shares of the common stock of the "new or re-organized company" be issued to Pennewill and Barnard "full paid, in consideration of the one thousand (1,000) shares of stock now held by them and the business of the company." The complainant testified that at the time the agreement of December 19, 1911, was signed he did not know, and it appears that until after the bringing of this suit, he never did know that there were other holders of stock in the company than Barnard and Pennewill, save that he "thought Mr. Ellison held one share which had probably been issued to him and endorsed, so he could have the office of president," and that nobody had told him so, "but he was the president, and he must have had a share." Although Pennewill testified as to the holdings of the stock of the company at the time of the signing of the agreement of December 19, 1911, he does not say, and there is absolutely no evidence, that until after the filing of the bill the complainant had been informed or was aware that at the time of the Wool Club conference or on December 19, 1911, or thereafter, substantially all of the stock was not owned and controlled by Barnard and Pennewill, as falsely recited and declared by them. In fact in the bill as originally filed the complainant, evidently relying upon such false statements, averred that Pennewill and Barnard "owned and controlled the capital stock" of the company; but in the amendment to the bill filed six months later declared that before and at the time of the execution of that agreement it was "falsely and fraudulently represented" to the complainant by Pennewill and Barnard, and "the contract falsely and fraud-

ulently set forth, that they owned and controlled the capital stock of the said Stetson and Ellison Company."

Secrecy is of the essence of fraud and those meditating the latter do not proclaim their nefarious purpose from the housetops. Consequently, almost without exception, the proof of fraud must depend upon evidence of circumstances which in their totality clearly establish it. I say in their totality, for even though the circumstances in a given case taken individually and separately may not be sufficient to sustain the charge, yet when considered collectively they may leave no escape from its truth. On this subject Mr. Justice Mitchell in delivering the opinion of the court in Montgomery Web Co. v. Dienelt, 133 Pa. 585, 19 Atl. 428, 19 Am. St. Rep. 663, forcibly said:

"Fraud, as has so often been said, can rarely be proved by direct and positive testimony, and great liberality is always allowed in the introduction of evidence having a tendency to show it. * * * Defendants had to get their testimony from the other side, and from the circumstances, and were not able to make positive and direct proof of the fraudulent intent, but had to rely upon circumstances pointing thereto. In his charge, the learned judge took these up seriatim, and disposed of them summarily. * * * The substantial defect of the charge is in its treatment of the items of evidence, one by one, without at any time directing the view of the jury to their united force. There probably never was a case of circumstantial evidence that could not be blown to the winds by taking up each item separately, and dismissing it with the conclusion that it does not prove the case. The cumulative force of many separate matters, each perhaps slight, as in the familiar bundle of twigs, constitutes the strength of circumstantial proof."

In order that the company should further enjoy the services of the complainant it was necessary, owing to the stand taken by him, that its charter should be amended in such manner as, among other things, to allow the issue of more capital stock. Under the laws of Delaware this could be effected only through affirmative action by a majority of the board of directors approved by the holders of a majority of the capital stock. As Barnard and Pennewill had only 350 out of 1,000 shares, they had not the power, without the co-operation of other stockholders, to secure the requisite amendment. If Ellison, after the Wool Club conference, and prior to December 19, 1911, had been in sufficient possession of his faculties and, after having had the proposed scheme embodied in the written agreement of that date laid before him, had in good faith said to Barnard and Pennewill "Well, go ahead boys, I leave it to you," there would have been no reason, if they intended to carry that scheme into execution, why they should make a false statement as to the ownership and control of the capital stock. For they were a majority of the board of directors and with Ellison held a majority of the whole capital stock, namely, 520 of the 1,000 shares and would have been able to secure the requisite amendment of the company's charter or its reorganization. The making of these false statements affords cogent evidence that they either could not control Ellison's stock or did not intend to secure the amendment or reorganization they agreed to obtain; or, in other words, that they lacked either the expectation or the intention of securing the change in the charter contemplated in the agreement. Barnard and Pennewill were in a position where they could not secure the services

of the complainant without deceiving him as to the control and ownership of the stock, and the evidence satisfies me that their false statements were made for the purpose of securing those services for the company and without any intention on their part that the complainant should enjoy the benefits of those provisions in the agreement which served as the sole or principal inducement for his becoming a party to it. The fact that they practiced this fraud upon the complainant in order to have the benefit of his services is the highest tribute they could pay to his fidelity and efficiency.

[1-5] It is urged on behalf of the defendants that the company was not a party to the agreement of December 19, 1911, and that if it possessed any validity it bound only the individuals who signed it. The agreement from beginning to end related to the business and affairs of the company—the amendment of its charter, the salaries of its officers, the enlargement of its operations, and other matters affecting its interests, and not to any private or individual interests of those signing it, dissociated from the interests of the company. It is true that the performance of the various things provided for in the agreement would affect individual interests of Pennewill, Barnard and the complainant, but only as connected with and growing out of the business and affairs of the company. It was signed by Pennewill and Barnard clearly on behalf of the company and for its intended benefit. Pennewill, Barnard and the complainant were all of full age and sound mind and were competent to contract, and the two former by reason of their fraudulent statements touching stock ownership and control are estopped from denying in this suit, brought by one innocent of the fraud, that they did own and control all of the capital stock of the company, and, being a majority of the board of directors, had it within their power to secure the proposed amendment of the charter and to cause to be done all other things necessary under the provisions of the agreement to be done on the part of the company. Their relationship to the company was such that it was chargeable with knowledge of the fraud practiced by them, and would become equally liable with them for its consequences by ratifying and adopting the agreement, though not originally authorizing it. It appears from the evidence that Ellison, the president of the company, was at the time of the hearing about eighty years old, very feeble and of impaired faculties; that, as admitted by counsel on both sides, he was not in a condition to testify intelligently; and that he had not been actively engaged in the business of the company since 1907 or 1908, nor since that time taken part in directing its policy or affairs. It is to be inferred that he was continued in the presidency of the company on account of his long association with it and by reason of the family ties existing between himself and Barnard and Pennewill. The two latter, directors and respectively vice president and secretary and treasurer of the company, served as its eyes, ears and mind. Whatever they saw, heard or learned touching its business or affairs was seen, heard or learned by it. The ratification or adoption by the company of the agreement of December 19, 1911, could not serve to shield Pennewill and Barnard from responsibility for the consequences of their own fraud. It is urged that the minutes of the company do not

disclose either authorization or ratification and adoption of the agreement. This is unimportant. The occurrence of acts does not depend upon the record which may be made of them; and it is settled law that corporate minutes are not the only medium of proof of corporate action. The question in this immediate connection is one of substance rather than form. It is whether the continued course of action of the company through its officers and agents, with knowledge of which it was chargeable, was not clearly inconsistent with the idea that it had not adopted the agreement of December 19, 1911. It appears that the company even before its execution contemplated the ratification and adoption of that agreement. [The court here referred to sundry documentary evidence leading to this conclusion.] It may be added, as will hereinafter appear, that the existence and value to the complainant of the agreement of December 19, 1911, and of the modification thereof made July 25, 1912, received on a number of occasions the implied recognition of the company through demands made by it through Barnard for the surrender or relinquishment of that agreement and its modification for the benefit of the company. It is unnecessary to refer to the many other circumstances showing ratification and adoption by the company of that agreement.

That agreement provided in substance, among other things, that on or before January 1, 1912, the charter of the company should be so altered that the capital stock should be $250,000, consisting of 1,500 shares of common stock, and 1,000 shares of preferred stock, of the par value of $100 each; that in consideration of the complainant's becoming the general manager of the "new or reorganized company" and of his selling all of the preferred stock at par and without commissions, 500 shares or one-third of the common stock should be transferred to the complainant, a certificate for the same to be deposited in escrow with and held by the Baltimore Trust Company, and by that company delivered to the complainant when he should have disposed of all the preferred stock "or so much thereof as shall be agreed upon by any two of the parties hereto" and should have "brought the business of the said new or reorganized company to a showing of at least a net yearly profit above fixed charges and expenses," as therein defined, of $45,000; that if the complainant should fail to sell the preferred stock, or so much thereof as should be agreed upon as above mentioned, and to bring the net annual profit up to $45,000 on or before January 1, 1922, the certificate of stock so deposited with the trust company should be returned to Pennewill and Barnard; that the complainant during the period the stock certificate should be held in escrow by the trust company, should receive "any and all dividends that may be declared on the common stock of the said new or reorganized company for the shares so held in escro"; that commencing with January 1, 1912, annual salaries to the officers of the "new or reorganized company" should be paid as follows: to Ellison, as president, $2,500; and to Pennewill as vice president, Barnard as secretary and treasurer, and to the complainant as general manager, $5,000 each; provided that only $300 per month should be paid to the last three named until the end of the fiscal year 1912; that the total

proceeds from the sale of the preferred stock should be paid into the treasury of the company and used for operating expenses incident to its business, for enlargement of its plant, the purchase of new plants, or otherwise, as the board of directors should direct; and that none of the parties to the agreement without the consent of the others should sell, hypothecate, or in any wise dispose of any of the common stock of the company.

[6] It was a matter of vital importance to the complainant that the charter of the company should be amended pursuant to the agreement. Until that should be effected it would be impossible that 500 shares of common stock should be set apart for him on the terms and conditions specified in the agreement, on compliance with the terms of which he would have the right to share equally with Barnard and Pennewill in the profits of the business. It was mainly, if not solely, the securing of such stock that constituted the inducement to his becoming a party to the agreement. The stipulated salary was not the moving cause; for during the expiring year of 1911 he had received compensation for his services larger by nearly $1,000, and yet was dissatisfied. It was the setting aside for him on his becoming general manager of the company and devoting himself to its service of one-third of the common stock to be held in escrow with the right to receive all dividends thereon until January 1, 1922, even if he failed earlier to comply with the terms and conditions on which would depend his right to receive the stock itself. Barnard and Pennewill knew this as well as the complainant. To secure his services at a salary inadequate when considered apart from the other provisions of the agreement in his favor, and at the same time withhold from him all opportunity for acquiring equal ownership in the stock would involve such further fraud on their part as might naturally be expected to follow the misstatement of their stock ownership and control. After agreeing without qualification that the charter of the company should be amended on or before January 1, 1912, it was incumbent on them to secure or at least attempt to secure such amendment. They did not secure it, and the evidence sufficiently shows that they made no bona fide attempt to that end. Pennewill's wife was the owner, as before stated, of 480 of the 1,000 shares constituting the total capital stock of the company, and if Pennewill and Barnard, notwithstanding their misstatements as to stock ownership and control, intended to live up to the provisions of the agreement of December 19, 1911, it is hardly conceivable that she should not have been consulted about the proposed amendment of the charter. Yet she testified that she never obtained knowledge or heard of that agreement prior to the institution of this suit; and that she had never been consulted by her husband or Barnard or any other person with respect to the making of such an agreement. Pennewill testified that he never either before or after the execution of that agreement discussed it with Ellison and never talked with him about it. It appears from his testimony that Ellison has not been actively engaged in the business of the company nor taken any part in directing its policies since 1907 or 1908. In view of the above it is somewhat remarkable that he should have given the following testimony:

"X. Then you were going on the presumption that Mr. Ellison would reorganize this company, according to the agreement which you entered into with Mr. Wright, without knowing whether he would do it, or not? A. On presumption, yes. X. Entirely on presumption? A. Yes."

The statement in the letter of December 17, 1911, from the company through Barnard to the complainant, "We have had our conference with Mr. Ellison which has ended as we predicted, 'Well, go ahead boys, I leave it to you,'" was either true or false. If it was true and Barnard believed Ellison to be mentally competent and in earnest, there was no legitimate reason for an omission on Barnard's part to co-operate with Pennewill and Ellison in securing the proposed charter amendment. The complainant testified to the effect that on December 19, 1911, after the signing of the agreement of that date he and Barnard and Pennewill arranged that the complainant should go to Delaware a few days later, and "we were to hold a meeting and arrange for changing the charter and various other things"; that he went to Dover where he met Pennewill and Barnard; that he "asked them if they were going to have a meeting, that if they were all ready, we would have the meeting"; that "they said that the matter was being carried through by their lawyers, that the papers were being drawn up and that the stock and everything would be fixed in a few days, so that the matter was simply in the hands of the lawyers, and everything would be fixed"; that the complainant had received a telegram from Chicago asking him to go there on some business of the company; and that they suggested that he should go to that city and "while I was out there they would attend to the details and put the reorganization through"; and that he accordingly went to Chicago about the end of 1911. No amendment of the charter, however, was secured as promised and agreed by Pennewill and Barnard. The defendants have not produced nor accounted for the absence of any lawyer or lawyers employed to "put the reorganization through," nor has any evidence been adduced that Pennewill and Barnard or either of them at any time attempted to secure an amendment of the charter in accordance with the agreement of December 19, 1911.

But, notwithstanding such default on the part of Pennewill and Barnard, the complainant, who was wholly unaware of the falsity of their statements as to stock ownership and control, continued actively and loyally to co-operate with them for the advancement of the company's business and welfare. I have discovered nothing in the testimony or in the documentary proofs indicating on the part of the complainant fraud, bad faith or indifference to the interests of the company; but, on the contrary, zealous efforts on his part in its behalf.

The complainant testified to the effect that he had an interview with Barnard and Pennewill in Camden, in the latter part of July, 1912; that the witness inquired as to the need for insurance on his life, he having been requested to have his life insured in the sum of $30,000 for the benefit of the company, because he had not discovered why they wanted such insurance; that they told him the trust company demanded about $90,000 insurance on the lives of Barnard, Pennewill and himself in equal portions, as additional collateral for the

loans that that company had made to the canning company; that the proposition of raising more money was not discussed at that time; that Barnard and Pennewill said "they had all the money they needed" and that "for operating expenses they would demand an advance from Libby, McNeil & Libby, (a corporation of Maine, doing business in Chicago, with which the canning company had a contract for furnishing tomato pulp, &c.,) as soon as the season started"; that after they stated that the company had all the money it needed the complainant said he felt it was "unfair to me to hold me down on my contract with the sale of that preferred stock, or any part of it"; that they seemed willing to make a change in the agreement of December 19, 1911, to meet his ideas, and the change was made; that it was written out by the complainant and signed July 25, 1912, as follows:

> "July 25th, 1912.
> "When debts of company for 1912 (as shown Dec. 31st, 1912) are liquated, company will be reorganized from $100,000.00 to $150,000.00 and $50,000.00 given to each. In case earnings do not equal $45,000.00 year, stock of H. L. W. to be placed in escro according to original agreement until earnings do reach same.　　　　　O. K.
> "H. L. Wright
> "R. C. Barnard
> "Wm. Pennewill."

The word "liquated" as used in the above agreement has been treated by counsel on both sides as intended for and as having the same significance as "liquidated," the omission of the letters "id" evidently being a mere clerical error. It is not without significance that the above modification was written and signed on letter paper of the company having on its heading "Wm. Ellison, President, Wm. Pennewill, Vice President, R. C. Barnard, Secretary & Treasurer, H. L. Wright, General Manager," thus implying the recognition and ratification of the agreement of December 19, 1911, subject to the modification. The modification was written in the railway station at Wyoming and on its face suggests haste in its preparation and a lack of the precision which should have characterized an agreement of its importance.

[7] Two questions have been raised as to the meaning of the modification: First, what do the debts of the company as shown December 31, 1912, include; and, secondly, what is the significance of the word "liquidated," as used in the modification. In order to ascertain the real intention of the parties to a contract containing expressions reasonably susceptible of more than one interpretation the situation of the parties and the surrounding circumstances may be taken into consideration. This is not to make a new contract for or defeat the intent of the parties, but to reach and enforce that intent. In Lowrey v. Hawaii, 206 U. S. 206, 222, 27 Sup. Ct. 622, 627 (51 L. Ed. 1026) the court said:

> "In Brooklyn Life Insurance Co. v. Dutcher, 95 U. S. 269 [24 L. Ed. 410] it was said: 'There is no surer way to find out what parties meant than to see what they have done.' So obvious and potent a principle hardly needs the repetition it has received. And equally obvious and potent is a resort to the circumstances and conditions which preceded a contract. Necessarily in such circumstances and conditions will be found the inducement

to the contract and a test of its purpose. The conventions of parties may change such circumstances and conditions, or continue them, but it cannot be separated from them."

[8-12] It is to be presumed, as against Pennewill, Barnard and the company as wrongdoers, that had it not been for their non-observance of the agreement of December 19, 1911, the complainant would have been before and during July, 1912, general manager of the company under an amended charter, and consequently entitled to receive dividends on one-third of the common stock while held in escrow, and have had the right until January 1, 1922, to sell the $100,000 of preferred stock or so much as should be deemed necessary, and thereby entitle himself to receive and enjoy for his own use the common stock so held in escrow. The modification of the agreement signed July 25, 1912, required as a condition precedent to the increase in the capital stock from $100,000 to $150,000, that the "debts of the company for 1912 (as shown Dec. 31st, 1912)" should be "liquidated," and further provided in effect that if the net earnings or profits of the company should not equal $45,000 a year at the time such increase in the capital stock should be effected the $50,000 of stock intended for the complainant should be placed and held in escrow according to the original agreement until the net earnings or profits should reach that sum. The modification did not contemplate the creation of preferred stock, but only of common stock, and therefore eliminated the provision in the original agreement requiring the complainant to sell preferred stock as a condition precedent to his receipt of common stock for his own benefit. But, on the other hand, while under the original agreement the complainant after becoming general manager and devoting his attention to the business of the company, would be entitled to receive dividends on the stock held in escrow, under the modification he could not receive stock or any dividends until after the debts of the company for 1912, as shown on the last day of that year, should be liquidated, for the reason that it was only after such liquidation that the increase in the capital stock was to be effected. It is urged on the part of the complainant that the word "liquidated" as used in the modification does not mean paid, but only ascertained. Generally speaking, the term may signify either paid or ascertained; but when applied to debts of the company as shown at a certain time it evidently has reference to debts as shown by the company's books or statements, and unless it means paid, the term would possess no independent force of its own. I am satisfied that the "debts of the company for 1912" mean its debts incurred in that year in the course of its ordinary business, and not debts for large loans made to it for the purpose of the erection, enlargement or multiplication of canning plants. Debts of the latter character for permanent structures could not with propriety be designated "debts for 1912." There is another consideration possessing much force in this connection. If under the modification it had been a condition precedent to the acquisition by the complainant of any right to stock that the debts incurred by the company in 1912 for the enlargement of its plants should be paid, his situation would have been infinitely worse than it could have been under the original agreement. The mere substitution for such debts of indebted-

ness to other persons clearly would not be performance of the condition precedent as contemplated and intended in the modification; and the actual payment of such debts would have involved either inordinate delay or the paralysis of its business, and have postponed indefinitely compliance with the condition precedent. Payment of the ordinary indebtedness for 1912 being under the terms of the modification necessary to the reorganization of the company and the increase of its stock and the enjoyment by the complainant of stock or dividends thereon, it was the duty, not of the complainant, but of the company to pay such indebtedness. The agreement of December 19, 1911, recognized that all of the parties to it were "desirous of increasing the plant and output of the said company"; but in view of the fraud and deception practiced upon the complainant, and of his loyal and unremitting attention to its interests, the company was in equity bound, before expending the large amounts necessary for the construction and enlargement of its plants to apply a sufficient sum to pay the indebtedness for 1912 remaining unpaid at the expiration of that year, amounting to a comparatively small sum. Further, the evidence shows and it was admitted by Pennewill in his testimony that the net profits of the company for 1912 after payment of salaries were at least in excess of $11,000. He stated, however, in substance, that there was an indebtedness of from $15,000 to $20,000 from the preceding year. But whatever indebtedness existed in the preceding year could not constitute "debts for the year 1912." The omission by the company to make such payment was a deliberate disregard of its duty to secure performance of the condition precedent and a fraud upon the complainant, of which neither it nor Pennewill or Barnard can take advantage. Consequently the case is to be treated in all respects as if the "debts of the company for 1912," as shown on the last day of that year, had been duly "liquidated." At the request of the company through Barnard the complainant took out or permitted to be taken out August 29, 1912,—a month after the execution of the modification of the original agreement of December 19, 1911,—insurance on his life in favor of the company in the sum of $30,000, and the policies representing that amount were assigned September 20, 1912, to the trust company as collateral security for loans made to the canning company for the purpose of defraying the cost of enlarging and extending its plants. Common gratitude, if no other higher motive, should have secured from the company for the complainant fair treatment for the protection of his interests. But he did not receive it.

The evidence discloses a set purpose on the part of the company and its two active directors to reap the benefit of the complainant's services and at the same time to withhold from him the principal benefit and advantage they had ostensibly intended to secure for him. The testimony of the complainant on this branch of the case is natural, inherently credible, and accords with the fact that the agreement of December 19, 1911, and its modification were finally nullified by the company, Barnard and Pennewill, so far as they had power to do so, in the spring of 1913, as hereinafter set forth. [The complainant's testimony and other evidence were here reviewed.]

[13] It appears from the evidence that, as above stated, the com-

plainant did not work for the company after February, 1913. In ceasing so to work, however, he was not guilty of a voluntary abandonment of the contract under which he had rendered faithful service. He is to be regarded as having been discharged or prevented by fraud and wrongdoing from the further performance of his duties. To justify a servant in leaving the service of his master without forfeiting or injuriously affecting his rights it is not necessary that he should be ejected by force from the place allotted to him for the carrying on of his work. He is justified in leaving when the acts or conduct of the master toward him have prevented the performance of further service, or are of such a character as to render his further continuance in the service intolerable to any self-respecting man. The company, Barnard and Pennewill left the complainant no other course than to retire at the end of February, 1913. They had fraudulently omitted to secure an amendment of the charter or to set apart stock to be held in escrow for him; they had wrongfully taken out of his hands the conduct of negotiations entrusted to him and properly belonging to one in his position; repeated efforts had been made to induce him to surrender his agreement and it had been declared by the company through Barnard to be of no value; no salary had been paid him in 1913 nor had he received the $1,400 reserved from his salary for 1912. Under these circumstances the complainant in leaving the service of the company was guilty of no wrong and forfeited none of his rights.

It appears from the evidence that the certificate of incorporation of the canning company was amended March 27, 1913, by striking out the provision limiting its capital stock to $100,000, and specifying $35,000 of capital stock for the commencement of business, and inserting in lieu thereof the following:

"The amount of the total authorized capital stock of this corporation is two hundred thousand dollars ($200,000.00), divided into two thousand (2,000) shares of one hundred dollars ($100.00) each. The amount of capital stock with which it will commence business is one hundred thousand dollars ($100,000) being one thousand (1,000) shares of one hundred dollars ($100) each."

[The evidence relating to this amendment and the issuance of the additional stock was here referred to.]

There is evidence to show that the complainant had no knowledge or suspicion of the contract of March 13, 1913, and of the amendment of the certificate of incorporation March 27, 1913, until long afterwards. Further, it appears from the evidence that the execution of that contract and the amendment of the charter followed and were in consequence of a contract between the company and Libby, McNeil & Libby for an increase in the supply of tomato pulp by the company to that concern, the negotiations for which contract were taken out of the hands of the complainant in January, 1913, as before stated, by the company through Barnard. The amendment of the company's charter March 27, 1913, and the subsequent issue of stock to the exclusion of the complainant as above mentioned were the consummation of the fraud and wrong perpetrated by the company, Barnard and

Pennewill upon him. After this wanton violation of his rights they evidently felt uneasy as to the possibility or probability of being held to account for their fraud, and nothing could be more natural than that an attempt should be made to approach the complainant in such manner as to do away with the danger of litigation. It appears from the testimony of the complainant that during or about the month of May, 1913, Barnard visited New York and "invited me to lunch. He was looking, mostly, for information; wanted to know what I was doing, and so forth. No proposals were made at that time. He seemed afraid to make any proposals." It further appears that Barnard called in August, 1913, upon the complainant at Great Neck, Long Island, where he lived and made certain proposals at that time; asking the complainant to surrender the contract of December 19, 1911, as modified, and offering to employ him at a salary of $3,000 a year if he would come back as a selling agent. The complainant inquired "What becomes of my interest in the business?" and Barnard replied, "There is no interest on the business. We are hooked up with other people, now, and the old deal doesn't count for anything."

It is difficult to conceive of a case more permeated with fraud than that now before this court. The evidence, direct and circumstantial, oral and documentary, has established to a moral certainty fraud and wrongdoing on the part of the company, Barnard and Pennewill, by which the complainant's rights were violated and his interests disregarded.

It is contended on the part of the defendants, and there is some evidence to the effect, that the contract negotiated by the complainant between the company and Libby, McNeil & Libby in January, 1912, for the furnishing of tomato pulp by the former to the latter was disadvantageous to the company, but advantageous to Libby, McNeil & Libby on account of the low price to be received by the company for the pulp. Pennewill testified to the effect that it was partly or wholly owing to the execution of the above mentioned contract that the amendment of the charter of March 27, 1913, was secured under which Libby, McNeil & Libby acquired an interest through their representatives. I fail to perceive any force in this contention or its relevancy to the issues involved in this case. If the contract just mentioned was disadvantageous to the company the responsibility for its improvident character rests upon the company and not the complainant, for the former through Barnard and not the latter determined the prices on which the contract was bottomed. Further, the contract received the attention and approval of both Pennewill and Barnard who as men of practical experience in the canning business, unlike the complainant, were more familiar with the cost of production. But aside from these considerations, no disadvantageous feature in the contract could justify the practicing by the company, Barnard and Pennewill of fraud upon the complainant.

[14] It is also contended on the part of the defendants that the complainant promised to raise the requisite amount of money for the enlargement of and additions to the company's plants and failed to do so. Pennewill testified to the effect that at the conference in the office

of the company in New York between the complainant, Barnard and himself, shortly before the execution of the agreement of December 19, 1911, Wright "stated to us, 'Why, it is no trouble for me to go out and get all the money that you fellows want.' And he said, 'You can go right ahead with the plant, enlarge your business, and I will see that you get the money.' * * * Mr. Wright assured us he could raise all the money we wanted in sixty to ninety days," and that the witness believed he could do it. He further testified:

"X. Then, Mr. Pennewill, the Stetson and Ellison Company went ahead and put up these factories, or negotiated for these factories, simply on the faith that they had in Mr. Wright's words that he could raise this money in ninety days? A. Right. I won't say raise it all in ninety days, but he said he could the better portion of it in ninety days—a big portion of it."

Pennewill's testimony in this connection must be rejected. If the company had faith in the ability of the complainant to raise money for enlargements and additions, as stated by him, according to Pennewill's testimony, it is difficult to account for the fact that in the agreement executed shortly afterward he was allowed ten years within which to dispose of $100,000 of preferred stock for the same purpose. Further, Pennewill's testimony on the above point is inconsistent with that of the complainant. Fraud in fact is an acted lie, and the testimony of a party to the fraud touching the fraudulent transaction, if not against interest, is entitled to little, if any, weight. He has discredited himself; and such testimony, uncorroborated and coming from a party to the cause testifying in his own behalf, should not be permitted to avail against the inherent probabilities of the case, to say nothing of apparently truthful evidence given by others innocent of wrongdoing.

[15] The complainant received no part of the sum of $1,400, the amount reserved out of his salary for the year 1912, nor anything on account of salary for the year 1913. He has been deprived, so far as the defendants had power to do so, of the opportunity of acquiring any portion of the capital stock of the company, and he has also been deprived, so far as they had power to do so, of the opportunity to receive any dividends on any portion of the stock during the stipulated period expiring January 1, 1922. That he is entitled to relief of some kind in this case I have no doubt. The jurisdiction in equity on the pleadings and proofs cannot successfully be challenged. Boyce's Executors v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655; Watson v. Sutherland, 5 Wall. 74, 78, 18 L. Ed. 580; Insurance Co. v. Bailey, 13 Wall. 616, 621, 20 L. Ed. 501; Lewis v. Cocks, 23 Wall. 466, 470, 23 L. Ed. 70; Drexel v. Berney, 122 U. S. 241, 252, 7 Sup. Ct. 1200, 30 L. Ed. 1219; Rich v. Braxton, 158 U. S. 375, 406, 15 Sup. Ct. 1006, 39 L. Ed. 1022; Kilbourn v. Sunderland, 130 U. S. 505, 514, 9 Sup. Ct. 594, 32 L. Ed. 1005; Jones v. Mutual Fidelity Co. (C. C.) 123 Fed. 506, 520. And rule 23 of the equity rules prescribed by the Supreme Court (198 Fed. xxiv, 115 C. C. A. xxiv) provides that "if in a suit in equity a matter ordinarily determinable at law arises, such matter shall be determined in that suit according to the principles applicable, without sending the case or question to the law side of the court." It is a serious question, however, to what extent relief can be accorded the complainant. Aside from the prayers for answer, subpoena and for

inspection of books, papers, &c., the bill prays that an account may be taken of what is due to the complainant from the defendants under the agreement of December 19, 1911, as amended July 25, 1912, and that they may be decreed to pay to him the amount found due together with the costs of this suit; that the defendants may be restrained from directly or indirectly selling or disposing of any of the capital stock of the company, or from selling, disposing of or encumbering any of their or its real estate or personal property, in violation of the rights of the complainant; that the court may impress the stock of the company with a trust in favor of the complainant to the extent of one-third of the capital stock of the company, and decree the delivery of that portion of the stock to him; and that the complainant may have such other or further relief as the nature of the case may require.

[16-21] Presumptions of damage or loss of gain are indulged by courts as against wrongdoers in order that just compensation may be made to those who have suffered from the wrong. Such presumptions to be just must be reasonable. Otherwise they would be calculated to work possible or probable injustice. The presumption must have relation to loss or damage which there is a reasonable probability would not have occurred had the wrong not been committed. It does not exist with respect to purely speculative loss or damage, or that of which there is only a possibility more or less remote. Some of the relief prayed clearly cannot be given. I perceive no ground on which the court could impress one-third of the stock of the company with a trust in favor of the complainant, and decree its delivery to him. The evidence excludes the idea that the company is in possession of any treasury stock. All of its stock is owned by individuals and beyond its control, and under no circumstances could a trust be impressed upon the stock of individuals who are not parties to the cause. Whatever equity the complainant might conceivably have as against the stock of Pennewill or Barnard's estate, would necessarily grow out of the agreement of December 19, 1911, as subsequently modified, and the fraud of Barnard, Pennewill and the company in relation to it. It was necessary under the agreement as modified, even had the charter of the company been amended, that the complainant should bring the net profits of the company up to $45,000 a year before becoming entitled to any portion of the capital stock. The evidence does not show that he succeeded in doing this, although he largely increased its profits. It is true that had no fraud been practiced against him he might have raised the net profits to the required sum prior to January 1, 1922, but whether he would have done so is largely, if not wholly, conjectural. His success would have depended upon conditions and circumstances which could not be foretold with any degree of accuracy, and the presumption against a wrongdoer cannot safely be carried so far as to cover such a doubtful and speculative gain. Practically the same considerations require the denial of the prayer that the defendants be restrained from disposing of their capital stock in the company. The portion of the prayer relating to the selling or encumbering of real estate or personal property "in violation of the rights of the complainant" is too vague and indefinite to be enforced. But the complainant was grossly wronged and defrauded by the company,

Barnard and Pennewill, and may under the prayer for other and further relief be entitled to such as is consistent with the case as made by the pleadings and evidence. It is to be presumed that, if the company, Barnard and Pennewill had lived up to the agreement of December 19, 1911, and had secured the amendment of the charter contemplated in that agreement, in view of the fact that the complainant was recognized as general manager and devoted his attention to the business of the company, one-third of $150,000 of common stock would have been placed in escrow, the dividends on which, pursuant to the agreement, were to be received and enjoyed by the complainant. Such a presumption is not strained but reasonable and founded upon a reasonable probability. The securing of the contemplated amendment would not have destroyed the identity of the company. Its management would have remained unaffected. It is true that the agreement of December 19, 1911, in referring to the company after the amendment to its charter should have been secured, used the phrase "the new or re-organized company." This on the face of the agreement was a misnomer. The amendment of the certificate of incorporation of the company March 27, 1913, did not change its identity. And equally a change in the charter of the company in accordance with the agreement above referred to would have been without effect so far as affecting the identity of the company is concerned. So, if the company, Barnard and Pennewill had lived up to the agreement of December 19, 1911, as modified July 25, 1912, the complainant would equally have been entitled to receive and would have received a dividend or dividends on one-third of $150,000 of common stock held in escrow for the debts of the company for the year 1912, as shown on the last day of that year, were either paid or should have been paid, as the company that year had net profits amounting to at least a sum in excess of $11,000, after payment of all salaries. If the company did not pay the debts for that year as so shown a fraud or wrong was thereby committed against the complainant of which the company cannot take advantage.

[22] It is urged on the part of the defendants that the agreement of December 19, 1911, lacked mutuality of consideration, and, therefore, no relief can be obtained in this suit by the complainant. This objection is, I think, without force, for more than one reason. Fraud by which one is damaged is a substantive ground of action both in equity and at law, on general principles, aside from the technical rules applying to contractual relations where the element of fraud is absent. The signing of the agreement of December 19, 1911, by Barnard and Pennewill, in conjunction with the complainant, amounted in law to a representation of fact by them, namely, that they had at the time an intention to do what they said they would do, and such intention on their part not existing, as has been shown, they were guilty of a false representation of fact. Rogers v. Virginia-Carolina Chemical Co., 149 Fed. 1, 78 C. C. A. 615; Edginton v. Fitzmaurice, 29 L. R. Ch. Div. 459; Johnson v. Monell, *41 N. Y. 655; Stewart v. Emerson, 52 N. H. 301; Ayres v. French, 41 Conn. 142; Laing v. McKee, 13 Mich. 124, 87 Am. Dec. 738. In the first named case the circuit court of appeals for the third circuit said:

"There is a prima facie presumption of fairness and honesty in the dealings of mankind, and, where one man makes a promise to another as an inducement for a change of position or other action on the part of the latter, he, if not expressly, impliedly avers that he has an existing intent to fulfil his promise, and such implied averment of existing intent is of matter of fact and, if false and fraudulent, is a fraudulent representation, which may or may not, according to circumstances, furnish the basis for an action ex delicto."

[23] I am satisfied that this suit is maintainable on the broad ground of the fraud and wrongdoing of the company, Barnard and Pennewill, relative to the agreement of December 19, 1911, and to that agreement as modified July 25, 1912. Further, whatever view might be taken, in the absence of fraud, as to the presence of mutuality of consideration as disclosed on the face of the original agreement, that agreement as modified is not justly liable to criticism on that ground. The complainant had been working for the company for six months prior to the making of the modification. The modification recognized the validity of the original agreement under which the company had been acting in the payment of salary and other respects. It dispensed with the provision for preferred stock, and provided that on payment of the debts of the company for 1912 its common stock should be increased from $100,000 to $150,000, to be equally shared by Barnard, Pennewill and the complainant; "the stock of H. L. W.," if the net profits did not equal $45,000 a year, to be placed in escrow according to the original agreement "until earnings do reach same." The modification recognized that the status of the complainant was such as to entitle him to dividends on stock in escrow after the debts of the company for 1912 should be paid, and, further, to the stock which should have been placed in escrow as soon as he should bring the net earnings of the company up to $45,000 a year prior to January 1, 1922. The services rendered or to be rendered by the complainant to the company constituted ample consideration to support in his favor the agreement as modified.

[24] Although the agreement of December 19, 1911, as modified, contemplated the placing of $50,000 of the common stock in escrow, that sum cannot equitably furnish the basis for the ascertainment of the amount which should be paid to the complainant if he be entitled to damages measured by the amount of dividends. The capital stock of the company until its charter was amended March 27, 1913, was $100,000. By that amendment it was increased to $200,000, consisting exclusively of common stock. Libby, McNeil & Libby through its representatives subscribed for $100,000 of this stock. The residue of the stock, namely, $100,000, represented the amount of the original stock of the company, and one-third of that amount, or $33,333.33, must be taken as the basis for the computation of dividends measuring the amount of damages to which the complainant may be entitled, that sum being one-third of the par value of the stock owned by Ellison, Pennewill, Mrs. Pennewill and Barnard prior to the acquisition by Libby, McNeil & Libby of an interest in the company.

Shortly after the opening of the trial, the complainant being on the stand, objection was made to "his assuming to testify to any conver-

sation between him and Mr. Barnard" on the ground that "Mr. Barnard's estate is a defendant in this suit, and under the statute in this state the witness being the complainant cannot testify to any transactions with the deceased." Barnard died September 1, 1914. The court sustained the objection in so far as Barnard's estate was concerned, but overruled it in so far as it applied to the company. No objection was made that under no circumstances could a statement by Barnard be admissible against the company, but that, not being admissible against Barnard's estate, the evidential value of the proposed testimony could not be separated,—that it could not "be applicable to one phase of the case without being applicable to another phase of the case." By the act of Congress of June 29, 1906, c. 3608, 34 Stat. 618 (Comp. St. 1916, § 1464), section 858 of the revised statutes was amended to read as follows:

"Sec. 858. The competency of a witness to testify in any civil action, suit, or proceeding in the courts of the United States shall be determined by the laws of the state or territory in which the court is held."

The law of Delaware on this subject is found in section 4212 of the code of 1915, as follows:

"No person shall be incompetent to testify in any civil action or proceeding whether at law or in equity, because he is a party to the record or interested in the event of the suit, or matter to be determined: Provided, that in actions or proceedings by or against executors, administrators or guardians in which judgment or decree may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate or ward, unless called to testify thereto by the opposite party."

In order to render a party incompetent under this provision to testify it is necessary not only that the suit be an action or proceeding by or against an executor, administrator or guardian, in which judgment or decree may be rendered for or against him, but also that the proposed testimony relate to a "transaction with or statement by the testator, intestate or ward." This provision has received judicial construction in the state tribunals. In Krause v. Emmons, reported in 97 Atl. 238, the supreme court of Delaware said:

"It clearly appears from our statute that in actions by or against executors, etc., the parties are *not disqualified from testifying in their own behalf, but are disqualified only from giving testimony concerning any transaction with or statement* by the testator, etc., unless they are called to testify by the opposite party. The purpose of the legislatures in passing statutes of this kind is equality. In this state the intention was to prevent both parties, unless called as a witness by the opposite party, giving testimony of transactions with or statements by the deceased, concerning which the deceased, if living, could of his own knowledge contradict, corroborate or explain. So much depends upon the particular facts in each case, that it would practically be impossible to define the word 'transaction,' as used in the proviso, in terms sufficiently comprehensive so as to include all facts which would be considered a transaction, and at the same time exclude all facts which would not be a transaction within the meaning of the act. In general terms a transaction, within the terms of the statute, may be said to be an occurrence or action to which both decedent and the other party had knowledge, and to which the decedent if living would be equally qualified to testify with the other party."

[25] This court did not permit the complainant to testify as to any transaction with or statement by Barnard for the purpose of securing in this suit a decree against his estate, but expressly declined to do so. Any such testimony given by the complainant is valueless and has been disregarded for that purpose, and no decree can properly be rendered against that estate unless the complainant has established a demand against it by evidence wholly aside from his own testimony as to such transactions with or statements by Barnard. But testimony given by him as to transactions with or statements by Barnard in his official capacity as representing the company, for the purpose of securing a decree against it, is on a different footing. The only point remaining open for consideration in this immediate connection is whether, on the assumption that Barnard's estate at the time of the trial included capital stock in the company, a decree against the company for the payment of money to the complainant would, within the meaning of the Delaware statute, constitute a decree rendered against the executrix. If so, no decree could be rendered against the company unless the complainant should have established a demand against it by evidence wholly aside from his own testimony as to transactions with or statements by Barnard. But even on the above assumption as to stock ownership, a decree against the company would not be a decree against the executrix within the meaning of the statute. Potter v. National Bank, 102 U. S. 163, 26 L. Ed. 111; Snyder v. Fiedler, 139 U. S. 478, 11 Sup. Ct. 583, 35 L. Ed. 218. In both these cases the court had under consideration section 858, as then existing, of the U. S. revised statutes, which in all points material to the present case was similar to the Delaware statute. In the former case the court said:

"The existing statute (Rev. Stat. Sect. 858) seems too plain to require construction. The first clause of that section shows that there was in the mind of Congress two classes of witnesses,—those who were parties to the issue, that is, parties to the record; and those interested in the issue to be tried, that is, those who, although not parties to the record, held such relations to the issue that they would lose or gain by the direct legal operation and effect of the judgment. A witness may be interested in the issue without being a party thereto,—a distinction which seems to have been recognized in all the statutes to which reference has been made. But whether a party to or only interested in the issue, the witness is not to be excluded in the courts of the United States, upon either ground, except that in actions in which judgment may be rendered for or against an executor, administrator, or guardian, no party to the action can testify against the other as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. The proviso of Sect. 858 excludes only one of the classes described in its first clause,—those who are, technically, parties to the issue to be tried,—and we are not at liberty to suppose that Congress intended the word 'party,' as used in that proviso, to include both those who, according to the established rules of pleading and evidence, are parties to the issue, and those who, not being parties, have an interest in the result of that issue."

Under section 858, as then existing, a witness could not be excluded "because he is a party to or interested in the issue tried." Under the Delaware statute he is not to be excluded "because he is a party

to the record or interested in the event of the suit or matter to be determined." In substance these quoted provisions are the same, and the reasoning of the Supreme Court applies in full force to the Delaware statute. The evidence however, oral and documentary, especially the latter, satisfactorily establishes, wholly aside from any testimony given by the complainant as to Barnard's statements, fraud and wrongdoing on the part of the latter.

It appears that only one dividend was paid or declared after January 1, 1912, and before the bringing of this suit. That dividend, amounting to 20% on the $200,000 capital stock of the company was payable November 28, 1914. For the reasons hereinbefore given the complainant must be held entitled to receive primarily from the company by way of damages 20% on $33,333.33, being one-third of the $100,000 of capital stock other than that acquired pursuant to the negotiations with Libby, McNeil & Libby, such percentage amounting to $6,666.66, on which interest at the rate of 6% per annum is to be computed from November 28, 1914; also one-sixth of the amount of any further dividend or dividends heretofore declared or hereafter to be declared and which has or have become payable or shall become payable prior to the making of the final decree in this cause, together with interest thereon at the said rate to be computed from the time or times respectively when such dividend or dividends, if any, became or shall become payable; also his instalments of salary for January and February, 1913, each amounting to $416.66, aggregating $833.32, together with interest at the rate aforesaid, computed on one-half of said amount from February 1, 1913, and on the residue thereof from March 1, 1913; also the sum of $1,400 reserved from his salary for 1912, as hereinbefore mentioned, with interest thereon at the rate aforesaid from January 1, 1913, and also damages representing the net pecuniary loss sustained by the complainant from being wrongfully deprived through the fraud of the defendants of the opportunity of receiving the specified salary of $5,000 a year from the time to which it was paid as aforesaid until January 1, 1922; such net pecuniary loss to be ascertained in the light of the circumstances of the case, including probabilities of life, the complainant's earning capacity, and the extent to which he has offset or had the opportunity of offsetting or may reasonably be expected to offset his loss with respect to the non-receipt of the specified salary, to the end that just and equitable compensation, and no more, may be made him for the wrong he has suffered. Semet-Solway Co. v. Wilcox, 143 Fed. 839, 74 C. C. A. 635. I fear the measure of relief accorded to the complainant is not commensurate with the damage he has suffered from the wrong done to him, but I have been unable to discover any ground on which consistently with the principles controlling the presumption of damage or loss of gain as against wrongdoers more extensive relief can be given.

The case must be referred to a master for an accounting and ascertainment of damages the complainant may be entitled to receive aside from the items specifically mentioned in this opinion.

A decree in accordance with this opinion may be prepared and submitted.